IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                              CRIMINAL NO. 04-2 ERIE

DANIEL RAY HINES

EVIDENTIARY HEARING ON DEFENDANT'S 2255 MOTION

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, October 17, 2006.

APPEARANCES:
        MARSHALL J. PICCININI, Assistant United States
        Attorney, appearing on behalf of the Government.

        JOHN J. MEAD, Esquire, appearing on behalf of

the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1                    I N D E X

2

3      WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PETITIONER:

5  Daniel Ray Hines          4      8      18      --

6  Mary Ann Hines           45     46     51      --

7

8  FOR THE GOVERNMENT:

9  Thomas W. Patton         22     37     42,44    --

10   Thomas W. Patton        57     69     72      --

11

12              - - -

13

| 14 | EXHIBITS: | IDENTIFIED | ADMITTED |
|----|-----------|------------|----------|
| 15 | Government Exhibit 1 | 27 | 57 |
| 16 | Government Exhibit 2 | 57 | 60 |
| 17 | Government Exhibit 3 | 62 | 65 |
| 18 | Government Exhibit 4 | 62 | 65 |
| 19 | Government Exhibit 5 | 64 | 65 |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | - - - | | |
| 25 | | | |

3

1              P R O C E E D I N G S

2

3              (Whereupon, the proceedings began at 9:00 a.m., on

4    Tuesday, October 17, 2006, in Courtroom C.)

5

6              THE COURT:  This is the time set for a hearing on

7    the petitioner's motion to vacate sentence pursuant to 28

8    U.S.C. 2255.  The hearing is being held consistent with the

9    dictates of Solis_v._United_States, 252 F.3d 289 (3rd Cir.

10   2001).  Are we ready to go?

11           MR. MEAD:  Yes, your Honor.  Would I be proceeding,

12   your Honor?

13           THE COURT:  Yes.

14           MR. MEAD:  I think Mr. Patton is going to be here in

15   a few minutes, he's already here, he just ran to the restroom.

16   Either Mr. Piccinini or I will be calling him as a witness as

17   well.  There will only be Mr. Hines and Mr. Patton.

18           THE COURT:  Why don't you do this, Mr. Mead, while

19   we're waiting for him to come, if he's going to be your first

20   witness, let me just ask you a couple questions in terms of

21   focusing our inquiry.  Is it accurate for me to say that the

22   sole factual inquiry in this hearing today is whether or not as

23   a matter of fact your client requested that an appeal be taken

24   from his resentence of August 2, 2005?

25           MR. MEAD:  That's the only issue, your Honor.  Your

4

1    Honor, we can call Mr. Hines, I don't need Mr. Patton first.

2          MR. PICCININI:  Your Honor, as a preliminary matter,

3     in my discussions with Attorney Patton, when he comes back into

4     the courtroom -- he has not been willing to talk with

5     government counsel in our efforts to defend the Public

6     Defender's Office, indicating principally that he, without an

7     order from the court, his office did not believe that they

8     could sufficiently testify concerning the attorney-client

9     relationship.  Based upon the clear state of the law, in light

10     of the defendant's allegations concerning Mr. Patton's

11     ineffectiveness --

12          THE COURT:  It's a clear waiver of his

13     attorney-client privilege.

14          MR. PICCININI:  I believe that if Attorney Patton's

15     office is ordered by the court, indicating just verbally that

16     you find that the attorney-client privilege has been waived in

17     regards to the matters Mr. Hines raised and allow Mr. Patton to

18     testify in this regard.

19          THE COURT:  All right, very good.  Who are you going

20     to call first, Mr. Mead?

21          MR. MEAD:  I'll call Mr. Hines first, your Honor.

22          THE COURT:  All right.

23      DEPUTY CLERK:  Please raise your right hand.

24      DANIEL RAY HINES, PETITIONER HEREIN, SWORN

25          DIRECT EXAMINATION


5


1  BY MR. MEAD:

2  Q.   Sir, can you state your name, please?

3  A.   Daniel Hines.

4  Q.   Mr. Hines, I want to direct your attention back to August

5  of 2004.  Did you enter a guilty plea in this courtroom?

6  A.   Yes, I did.

7  Q.   What did you plead guilty to that day, sir?

8  A.   Conspiracy to manufacture.

9  Q.   And in November of 2004, were you sentenced for that

10  crime?

11  A.   Yes, I was.

12  Q.   Do you recall what your sentence was?

13  A.   140 months.

14  Q.   Do you recall if that was appealed?

15  A.   Yes, it was.

16  Q.   Do you know the result of that appeal?

17  A.  Yes, 135 months.

18      THE COURT:  Sir, keep your voice up, please.

19  BY MR. MEAD:

20  Q.  135 months you said?

21  A.  Yes.

22  Q.  During the guilty plea and the first sentencing and your

23  appeal, who was your attorney?

24  A.  Tom Patton.

25  Q.  And, to your knowledge, is he an Assistant Federal Public

6

1  Defender?

2  A.  Yes.

3  Q.  Do you recall in August of 2005 if you were resentenced?

4  A.  Yes, I was.

5  Q.  And do you recall what your resentencing was?

6  A.  135 months.

7  Q.  Following that resentencing, did you have any discussion

8  with Mr. Patton, your attorney, about whether or not you wanted

9  to appeal?

10  A.  Yes, I did.

11   Q.   Can you tell us about that discussion?

12   A.   After everything was done, I told him I'd like to try

13   again.  He told me that he didn't really think it would do any

14   good, that was all that was said.  Then the Marshals took me

15   away.

16          THE COURT:  Mr. Hines, would you start that all over

17   again, please.  Pull up and speak into the microphone.  Tell me

18   again slowly exactly what the substance of the conversation was

19   you had with Mr. Patton and where did it occur?

20          THE WITNESS:  When the hearing was over, I told him

21   I'd like to try it again, to have another appeal.  And he told

22   me he didn't think it would really do any good.  And then the

23   Marshals took me in there, there was nothing more said about

24   it.  I assumed he was going to file another appeal.

25   BY MR. MEAD:


                              7


1   Q.   Did you talk to Mr. Patton after the day of your second

2   sentencing?

3   A.   I never did.  But like six months went by, I never heard

4   nothing, I had my mom call and talk to him.  He said he never

5  filed another appeal and it was too late.

6  Q.   What is your mom's name?

7  A.   Mary Hines.

8  Q.   Did you correspond with Mr. Patton during that time?

9  A.   No, I never did personally.

10  Q.   All right.  Was there any reason you did not correspond

11  with him during that time period?

12  A.   I assumed he filed the appeal and it was just taking a

13  while to hear anything about it.

14  Q.   When did you find out the appeal had not been filed?

15  A.   When my mom called and talked to him.

16  Q.   Now, at the time of your sentencing, do you recall Judge

17  McLaughlin saying you had 10 days to file an appeal?

18  A.   Yeah, I remember him saying that.  But I assumed that the

19  lawyer already knew that, you know.

20  Q.   And at that time Mr. Patton was appointed to represent

21  you?

22  A.   Yes.

23  Q.   You weren't paying an attorney at that point?

24  A.   No.

25  Q.   Was there any reason you wouldn't have appealed at this

1  time?

2  A.   No.

3  Q.   Now, you filed your motion, your Habeas Corpus motion in

4  August, is that correct, of this year?

5  A.   July, I think it was.

6  Q.   July, all right.  Was there any reason you waited until

7  July?

8  A.   I didn't know that I could even do that until people

9  where I was told me that I could.  When I found out he didn't

10  file an appeal, I thought that was the end of it.  And I found

11  I could file a 2255.

12       MR. MEAD:  That's all I have, your Honor.

13       THE COURT:  Mr. Piccinini.

14            CROSS-EXAMINATION

15  BY MR. PICCININI:

16  Q.   Mr. Hines, would you agree with me that it was August 2nd

17  of 2005, that you were resentenced?

18  A.   Yes.

19  Q.   And you would also agree with me that Judge McLaughlin

20  made it very clear to you, just as he did in your first

21   sentencing, that you had 10 days in which to file your appeal,

22   is that correct?

23   A.    Yeah, I knew that.  But I figured Mr. Patton knew that,

24   that he would do it anyhow.

25   Q.    When you first appealed, after your original sentencing


9


1   in 2004, do you recall that within 10 days of your sentencing

2   having seen documentation showing that an appeal had been

3   filed?

4   A.    I think it was longer than 10 days before I got any

5   paperwork.  But I did get paperwork, yes.

6   Q.    But it wasn't almost 12 months, was it?

7   A.    No.

8   Q.    It was sometime after sentencing, in fact, before you

9   were sent off to a federal correctional institution, before you

10   were designated, Mr. Patton went ahead and filed an appeal

11   within 10 days or whatever the time period was, and you knew

12   about it long before you were designated to a federal prison

13   and left Erie, isn't that true?

14   A.    No, I never got any paperwork until I got to Schuylkill.

15  Q.   Schuylkill?

16  A.   Yeah, that's where I went.

17  Q.   To the state correctional facility there or a federal

18  facility?

19  A.   Federal.

20  Q.   And how did you receive that paperwork from Mr. Patton?

21  A.   It came in the mail.

22  Q.   Did you write back to Mr. Patton or correspond with him

23  in any way?

24  A.   No.

25  Q.   Did you ever talk with Mr. Patton after that original

10

1  sentencing?

2  A.   Never, until I came back for my resentencing.

3  Q.   Okay.  When you received the paperwork, you could tell

4  from the paperwork what the issue was that Mr. Patton was

5  appealing, is that correct?

6  A.   Yes.

7  Q.   And you would agree with me that he raised the same

8  issues that you guys raised in your appeal, those related to

9   whether or not the judge needed to follow the Sentencing

10   Guidelines, and whether you should have gotten extra time for

11   the guns being there; do you remember that?

12   A.   Yeah.

13   Q.   And it was clear to you in the paperwork from Mr. Patton

14   that he was appealing those issues that you raised at the

15   sentencing, is that correct?

16   A.   Yes, it is.

17   Q.   On your behalf Mr. Patton won that appeal, didn't he?

18   A.   Yes.

19   Q.   The case was sent back for resentencing so that Judge

20   McLaughlin could resentence you under what was known as

21   United_States_v._Booker?

22   A.   Yes.

23   Q.   And you were satisfied with Mr. Patton's representation

24   of you at that time?

25   A.   Yeah, I think Mr. Patton is a nice guy, I have nothing


11


1   against him.  I don't know what happened.  I told him I wanted

2  to file again and for some reason it didn't happen, I don't

3  know why.

4  Q.   What did you want to file, what were you seeking?

5  A.   I'd like to get the gun enhancement taken off if it's at

6  all possible.

7  Q.   Well, hadn't that argument been addressed by Judge

8  McLaughlin having taken testimony for more than an hour here

9  during your sentencing?

10  A.   Yes.

11  Q.   And did you realize that when Mr. Patton got you back and

12  got you resentenced down to 135 months, didn't he explain to

13  you that the 135 months was part of the same Sentencing

14  Guidelines that would have applied even if the gun enhancement

15  didn't occur?

16  A.   Yes.

17  Q.   So you and Mr. Patton discussed the fact that a 135

18  months could have been the sentence you received whether there

19  was a gun enhancement or not?

20  A.   I knew that.

21  Q.   How did you know that?

22  A.   He told me that.

23  Q.   And when did Mr. Patton tell you that?

24  A.   Before I came into the court that day.

25  Q.   Okay.  So before coming into the court that day, you knew

12

1  that if the judge gave you 135 months, that sentence would have

2  been with or without the weapons enhancement, the gun

3  enhancement?

4  A.   Yeah, but with this gun enhancement, I can't go through

5  the drug program, I'd really like to be able to do that.

6  Q.   Okay.  But as far as the length of the sentence that you

7  got, you knew that it didn't matter the length Judge McLaughlin

8  gave you, whether the gun enhancement applied or not?

9  A.   Yes.

10  Q.   So Attorney Patton discussed that with you?

11  A.   Yes.

12  Q.   And isn't it true that you didn't realize about this drug

13  program and the problems you had with it from the gun

14  enhancement, until after you got back to the federal

15  correctional facility?

16  A.   No, I already knew before then that I couldn't take it

17  because of the gun enhancement.

18   Q.    Okay.  At what point in time did you discuss with

19   Attorney Patton that you wanted to appeal because you wanted to

20   get the drug program?

21   A.    As soon as the court hearing was over, I told him.

22         THE COURT:  Which one?

23         THE WITNESS:  When I got resentenced, I told him I'd

24   like to try again.  Because I'd like to get the enhancement

25   taken off if possible so I could go through the drug program.


13


1   I didn't explain all that to him, but I told him I wanted to

2   try again.

3   BY MR. PICCININI:

4   Q.    Okay.  When did this drug program problem come up,

5   because it was never raised in your first appeal, so you and

6   Mr. Patton hadn't seen that as an issue in your first appeal?

7   A.    I believe he mentioned it during the hearing.

8   Q.    Okay.  So at the end of sentencing hearing when Mr.

9   Patton talked about the drug program, that's something you and

10   he had discussed back at that time?

11   A.    I told Mr. Patton that was one of the things I wanted to

12  be able to do, was go to the drug program.

13      THE COURT:  I need to know timeframes on this, I

14  need to know which hearing, when is this conversation

15  happening?

16      THE WITNESS:  For my resentencing.

17  BY MR. PICCININI:

18  Q.   Before the resentencing or after the resentencing?

19  A.   I told him before that I couldn't go to the drug program

20  because of the enhancement.

21  Q.   You told him that?

22  A.   Yeah.

23  Q.   Or he told you that?

24  A.   I told him that because my case manager where I'm at told

25  me I wasn't qualified because of the gun enhancement.

14

1  Q.   Okay.  So you had to tell Attorney Patton that?

2  A.   Yes.

3      MR. PICCININI:  Your Honor, if you could just give

4  me one second to get some records.

5      THE COURT:  All right.

6  BY MR. PICCININI:

7  Q.   Now, concerning what you hope to gain on appeal, do you

8  agree with me that it wasn't your hope to have the sentence --

9  you didn't think you were going to be successful in having your

10  sentence reduced anymore, did you?

11        MR. MEAD:  The first appeal or the second appeal?

12  BY MR. PICCININI:

13  Q.   In your second appeal, you weren't seeking to have your

14  sentence reduced, you were just seeking, according to you

15  today, to have the gun enhancement removed?

16  A.   You're talking about why I filed the 2255?

17  Q.   I'm talking about what you hoped to gain when you told

18  Attorney Patton to appeal?

19  A.   Well, if I could have got time off, that would be good.

20  But I'd like to get the gun enhancement off so I can go to the

21  drug program.  I think the drug program would do more good for

22  me than all this time in jail would.

23  Q.   At any point in time, do you recall when Judge McLaughlin

24  asked you to speak on your own behalf at your resentencing, why

25  didn't you say something to Judge McLaughlin about your concern

1  about the drug program?

2  A.   I don't even know.

3  Q.   Well, if it was the main issue that you wanted to appeal,

4  just moments after Judge McLaughlin told you you could appeal,

5  why didn't you mention it before, why didn't you even mention

6  it to Judge McLaughlin?

7  A.   I don't know, I was nervous.

8       THE COURT:  Keep your voice up, please.

9       THE WITNESS:  I was nervous, I didn't know what to

10  say to him.

11  BY MR. PICCININI:

12  Q.   Well, on page 14 of the transcript from the resentencing

13  on August 2, 2005, this is your opportunity to explain to the

14  court what your concerns are and what it is you want with

15  regard to your resentencing.  And you say, "yes, your Honor,

16  when I was doing drugs, I never realized how bad it was for me

17  or anybody else around me.  Now I see that what it has done to

18  me and my family.  My kids don't even have no dad no more.  I

19  can't even explain how bad I feel about it.  But I'm just sorry

20  for what I've done.  Pretty near everyday I'd like to go back

21  to working and have a regular life again."  Judge McLaughlin

22  asks you how many kids you have.  At no point in time did you

23  ever mention anything about your new revelation that the gun

24  enhancement affected the drug program, you never mentioned that

25  at all to Judge McLaughlin what you're saying today about

16

1  wanting to get the drug program.  Why is it that, it's the

2  critical reason that you want to ask, that you supposedly ask

3  Mr. Patton to appeal, and that you had a discussion with Mr.

4  Patton just after you left this particular sentencing, why did

5  you never mention it to Judge McLaughlin?

6  A.    Tom Patton brought it up when he was talking to him.

7  Q.    But you're saying that this is the reason why you wanted

8  to appeal, that's what you told Attorney Patton, excuse me --

9  you're saying that you mentioned it to Attorney Patton, but you

10  never mentioned it to the judge.  I'm just trying to figure out

11  if that's the reason why you filed your appeal, why that is?

12  A.    I assumed it -- I understood they were probably going to

13  take the enhancement off and that's why I would get some time

14  off.  I honestly didn't know that much about the law to know

15  what was going on.

16  Q.    Now, with regard to Attorney Patton's discussion with

17  you, where did this discussion take place after your

18  resentencing?

19  A.    After I was resentenced?

20  Q.    Yes.

21  A.    Sitting right over there.

22  Q.    Sitting right over here in the courtroom, that's when you

23  told him that you wanted to appeal again?

24  A.    Yes.

25  Q.    What was the nature of your conversation?


17


1  A.    That was all I got to say, I just told him I'd like to

2  try again.  And then the Marshals were already getting me out

3  of here.

4  Q.    Did Attorney Patton explain to you that there was no

5  reasonable likelihood of you winning on appeal?

6  A.    The only thing he said was he didn't think it would do

7  any good.

8  Q.    Did you agree with him after he explained it to you

9  supposedly?

10  A.   No, the Marshals were taking me away.  He said he didn't

11  think it would do no good, but he didn't say he wasn't going to

12  do it.  I assumed he was still going to file it.

13  Q.   Okay.  And then how long did you stay in the Erie County

14  Prison before you went back to a federal facility?

15  A.   They took me back to Crawford County that same day.

16  Q.   How long did you stay in Crawford County?

17  A.   I think two weeks.

18  Q.   And then where did you go from there?

19  A.   Back to Schuylkill.

20  Q.   When you got to Schuylkill, did you have any

21  correspondence with Attorney Patton?

22  A.   No, I didn't.

23  Q.   Did he write to you or did you write to him?

24  A.   No.

25  Q.   Any phone conversations?

18

1  A.   Not until I had my mom call.

2  Q.   Well, the last time that you appealed, the first time

3    that you appealed, you indicated that you received the

4    paperwork shortly after getting to Schuylkill.  Didn't you

5    become concerned all the way up until July of the next year,

6    that you hadn't seen any appeal that you supposedly asked for?

7    A.    It took almost two months to get papers the first time.

8    Q.    I'm talking almost a year later, you still hadn't filed

9    this 2255 action claiming that you had asked for an appeal.

10    What was your thought process during almost 11 months since the

11    time of your sentencing?

12    A.    It was like five or six months, then I had my mom call

13    him.

14    Q.    Did she call or did she write a letter?

15    A.    She called him and talked to him.

16    Q.    Was there a letter that was written back to your mother

17    in any way?

18    A.    No.

19    Q.    Just a phone conversation?

20    A.    Yes.

21        MR. PICCININI:  Your Honor, those are all the

22    questions I have.

23        THE COURT:  Do you have anything else, Mr. Mead?

24        MR. MEAD:  Yes, your Honor.

25          REDIRECT EXAMINATION

19

1  BY MR. MEAD:

2  Q.   Mr. Hines, do you recall Mr. Patton speaking on your

3  behalf to the judge and indicating that you would not get

4  credit for your federal drug treatment if there was a gun

5  involved, correct?

6  A.   Yes.

7  Q.   He addressed that directly with Judge McLaughlin?

8  A.   Yes.

9  Q.   Do you feel like you had to address it again?

10  A.   No, I didn't.

11        MR. PICCININI:  Counsel, what hearing is that?

12        MR. MEAD:  Page 15 of the transcript.

13        THE COURT:  Which hearing?

14        MR. MEAD:  I'm sorry, the second one, your Honor.

15  BY MR. MEAD:

16  Q.   If I could read it into the record.  It's the transcript

17  of August 2, 2005, "Mr. Patton:  Your Honor, one other thing.

18  Even if Mr. Hines is admitted into the federal drug treatment

19  program because of the finding that there were firearms

20  involved in this offense, he will not receive a reduction.

21  The Court:  He won't get any credit?  Mr. Patton:  Correct,

22  they may let him into the program, but he will not receive any

23  reduction in his sentence because this will be classified as a

24  violent offense.  So, therefore, he's ineligible receiving a

25  reduction in sentence."  Do you recall that occurring?


20


1  A.  Yes.

2  Q.  Did you feel you needed to bring it to the judge again?

3  A.  No.

4  Q.  Do you also recall Mr. Patton at the beginning of the

5  proceedings, at the resentencing, indicating that he continued

6  to object to the two-level enhancement for the firearm?

7  A.  Yes.

8  Q.  Did you feel any reason that you had to bring it up again

9  at that point?

10  A.  No.

11      MR. MEAD:  That's all I have, thank you.

12      THE COURT:  Anything else, Mr. Piccinini?

13        MR. PICCININI:  No, your Honor.

14        THE COURT:  All right, you can step down.  Mr.

15   Piccinini, do you want to consult, after I put on the record,

16   indicate the waiver of attorney-client privilege, do you want

17   to speak with Mr. Patton before you put him on the stand?

18        MR. PICCININI:  If I may do so just briefly to see

19   if there's any documents in the file, so I don't fumble around

20   with that.

21        THE COURT:  Mr. Patton, I understand that there's a

22   concern on your part and your office's part as to the breach of

23   any attorney-client privilege in this case, is that right?

24        MR. PATTON:  Yes, sir.  I didn't want to turn

25   anything over until you had made a ruling.


21


1        THE COURT:  I find it's been waived and you can

2   testify with impunity on that issue.

3        MR. PATTON:  The subpoena had requested documents

4   and I do have one that may be responsive to that.  So based on

5   your ruling that the privilege has been waived, I will turn

6   that over to Mr. Piccinini.

7          THE COURT:  All right.  I'm going to take a short

8   recess, then you're going to have an opportunity to speak with

9   him.

10          (Recess from 9:25 a.m.; until 9:30 a.m.)

11          THE COURT:  All right, Mr. Piccinini.

12          MR. PICCININI:  Thank you, your Honor.

13          DEPUTY CLERK:  Can you raise your right hand.

14          THOMAS W. PATTON, GOVERNMENT WITNESS, SWORN

15          THE COURT:  All right, Mr. Piccinini.

16          MR. PICCININI:  I didn't know that I had called

17   Mr. Patton, but I'll be happy to do the direct examination.

18          THE COURT:  Just so I'm clear, I'm working under the

19   assumption that you were calling him on direct?

20          MR. PICCININI:  Counsel had called him to testify,

21   but, nonetheless, had he not called him to testify, I would

22   have done so.

23          MR. MEAD:  It doesn't matter to us, your Honor.

24          THE COURT:  All right, if it doesn't matter to you,

25   then go ahead.

22

1              DIRECT EXAMINATION

2  BY MR. PICCININI:

3  Q.   Attorney Patton, did you take on the representation of

4  Daniel Hines in your capacity as an Assistant Federal Public

5  Defender?

6  A.   Yes.

7  Q.   And during the course of your representation of Mr.

8  Hines, when it came to Mr. Hines entering a plea of guilty and

9  being sentenced here in federal court, do you recall, to a

10  general degree, the advocacy on your client's behalf at the

11  sentencing?

12  A.   At the first sentencing?

13  Q.   Yes.

14  A.   Yes.

15  Q.   And do you recall in this case that this was a sentencing

16  before Booker, after Apprendi, where issues related to the
         _____     _____

17  judge's discretion at sentencing were still up in the air, but

18  zealously advocated on behalf of criminal defendants?

19  A.   It was after Blakely was decided, but before Booker.
          _____      _____

20  Q.   So you were advocating Blakely issues concerning the
          _____

21   judge's ability to enhance the sentence and impose a sentence

22   under the guidelines?

23   A.    That's correct.

24   Q.    And, in addition, do you recall an issue that you raised

25   with regard to the two-level increase for weapons, the firearms

23

1   being present in Mr. Hines and Ms. Munnings' residence?

2   A.    Yes.

3   Q.    And there was lengthy testimony that day, I believe from

4   Special Agent Andy Petyak on that date?

5   A.    Yes.

6   Q.    After the resentence, Judge McLaughlin found the

7   two-level enhancement and sentenced your client to 140 months,

8   what steps were taken or what discussions were had between you

9   and Mr. Hines concerning an appeal?

10   A.    Well, based on the objections that we had filed prior to

11   the sentencing hearing, objecting to the manner, to the

12   application of the Sentencing Guidelines and objecting to the

13   gun, we filed an appeal to follow-up on both of those issues.

14   Q.    And with regard to the decision to file an appeal, was

15   that a matter that you and Mr. Hines discussed after the

16   original sentencing?

17   A.   I don't know if we talked about it afterwards or if in

18   the course of talking about the sentencing hearing, even before

19   the hearing, about what would happen based on whatever the

20   judge's rulings were at the sentencing hearing.  So I don't

21   know if we talked about it before the sentencing hearing or

22   after the sentencing hearing or both.

23   Q.   Well, in light of your advocacy in your history in the

24   Public Defender's Office in preparation for legal arguments,

25   either pretrial arguments or sentencing arguments, do you


                                    24


1   discuss with your client what steps would be taken, depending

2   on a certain outcome that may occur in a particular hearing?

3   A.   Well, often what happens is when you're having a

4   discussion with a client, I can't say that I remember having

5   this particular discussion with Mr. Hines, but very frequent

6   when you're talking about, whether it's a motion to suppress or

7   objections to a presentence report, we'll talk about what

8   objections we're filing, what motions we're filing, what our

9    arguments are going to be.  And the clients will often ask what

10   happens if we lose, what happens if we win.  We talk about the

11   likely outcomes and what action we'll take based upon whatever

12   decision the judge makes.

13   Q.    In this particular case after the original sentencing, do

14   you recall meeting with Mr. Hines, either at the Erie County

15   Prison or here in the federal courthouse, to discuss the

16   original Blakely weapons enhancement appeal that was filed?
         _____

17   A.    I don't remember talking to Dan about it.  I don't have

18   any independent memory of that.

19   Q.    Is there any documentation or any written correspondence

20   that you engage in with your clients when you make decisions

21   about filing appeals after sentencing?

22   A.    No.

23   Q.    And how would a defendant be notified if you do file an

24   appeal on their behalf?

25   A.    He will be sent a copy of the notice of appeal.  And

                                  25

1    depending on if I'm going to actually do the appeal or if it's

2    an attorney in our Pittsburgh office, we have an appellate

3    division in our Pittsburgh office, if they're doing the appeal,

4    the notice of appeal will be mailed to the client, along with

5    all the briefs and any correspondence received from the Court

6    of Appeals.

7    Q.    Are those notices of appeal filed within 10 days of the

8    sentencing, as Judge McLaughlin describes to your clients here

9    in courtroom?

10   A.    Yes.

11   Q.    How long does your office wait after the filing of the

12   notice of appeal before letting a client know that the appeal

13   has been filed?

14   A.    Well, I can't speak for the Pittsburgh office because I'm

15   not involved in that.  But our normal practice is once the

16   notice of appeal is filed, roughly at the same time a copy of

17   it gets sent out in the mail to the client.

18   Q.    When you send that through the federal prison system, is

19   there any documentation, is that sent certified mail, is there

20   any notice in the file with regard to when these documents are

21   submitted to your clients?

22   A.    No, we just keep copies of the letters that are sent.

23   Q.    In your search of your files in this case, do you have

24  copies of the letters sent to Mr. Hines concerning the original

25  notice of appeal that's filed in the original case?


26


1  A.   In the original?

2  Q.   The original sentencing?

3  A.   I don't think so, I believe the subpoena that we were

4  served, directed any correspondence that we had regarding any

5  conversations regarding the resentencing.  So I didn't look at

6  anything with regard to the original appeal.

7  Q.   Do you have your file?

8  A.   I do not.

9  Q.   Is it maintained here in Erie or down in Pittsburgh?

10  A.    It was here in Erie, but it was turned over to Attorney

11  Mead.

12  Q.   Pardon me.

13  A.   It was turned over to Attorney Mead.

14        MR. MEAD:  I don't have it with me, it's in my

15  office, but I didn't bring the entire file.

16  BY MR. PICCININI:

17  Q.    Well, with regard to whether you -- if a notice was sent

18  to the defendant shortly after the appeal was taken, a letter

19  indicating that a notice of appeal had been filed, if such a

20  thing happened, would a copy of that letter to the defendant

21  appear in the file?

22  A.   Yes, it should.

23  Q.   Now, as the normal course, after you are done with a

24  particular case up here in Erie and you're making decisions

25  about whether to file an appeal or whether your office in

27

1  Pittsburgh will file an appeal, whether to close out your

2  cases, how do you correspond with the Pittsburgh office to let

3  them know what the status of a case is after sentencing is over

4  with?

5  A.   Through e-mail.

6  Q.   And what is the purpose of your corresponding with

7  Pittsburgh when you're sending --

8  A.   Either myself or my secretary sends an e-mail to Karen

9  Gerlach, which is G-e-r-l-a-c-h, Karen is the head of our

10  appellate division in the Pittsburgh office.  We also send it

11  to Linda Martz, M-a-r-t-z, Linda is Karen's secretary, to let

12    them know whether or not a notice of appeal needs to be filed

13    or not.

14    Q.    Who in your office sends this e-mail to Karen Gerlach's

15    attention?

16    A.    Sometimes I send it, sometimes my secretary sends it.

17    Q.    And if your secretary sends an e-mail concerning the

18    status of a case after sentencing, does she receive the

19    information concerning the status from you?

20    A.    As far as I know.

21    Q.    Mr. Patton, I'm going to show you what I've marked as

22    Government Exhibit 1 for identification, can you identify this

23    document?

24    A.    That is a printed version of an e-mail that was sent from

25    Elizabeth Durkin, who is my secretary, on August 9, 2005, to


28


1    Karen Gerlach and Linda Martz, with a copy to me.

2    Q.    In the portions of this e-mail that have not been deleted

3    that relate to Daniel Hines, does this e-mail indicate that on

4    August 2, 2005, Daniel Hines was resentenced and that a

5    determination was made that no appeal would be filed?

6  A.    Yes, the e-mail indicates, has a date of 8/2/05, which I

7  believe was the date of Dan's resentencing, says Daniel Hines

8  resentencing, and it says "no appeal."

9  Q.    What does this particular document indicate to you with

10  regard to, at least what you told your staff, about an appeal

11  of Mr. Hines' case?

12  A.    Well, I don't have any independent recollection of

13  speaking to Ms. Durkin about the e-mail.  Based on our common

14  practice and looking at the e-mail, my assumption would be that

15  I told Ms. Durkin that there would not be any appeal of Mr.

16  Hines' resentencing.  So that she could pass that information

17  on to the Pittsburgh office.

18  Q.    Now, in this particular case with regards to the

19  resentencing, Mr. Hines testified here today that directly

20  after Judge McLaughlin sentenced him to a reduced sentence of

21  135 months, that he sat here in this courtroom and told you,

22  with regard to an appeal, told you that he'd like to try again.

23  Do you recall Mr. Hines telling you after the sentencing that

24  he'd like to try another appeal?

25  A.    I don't recall talking with Dan about an appeal.  I just

1  don't have any independent recollection.  It would be

2  consistent with my normal practice, to sit at counsel table

3  after a sentencing or in this case a resentencing, and discuss

4  appellate rights with a client.  I do that on a -- that's a

5  normal thing for me to do.

6  Q.    Is it normal for you, counsel, that when a defendant

7  after sentencing tells you that I'd like to try again, appeal

8  again, that you disregard his request and not file an appeal,

9  is that your normal practice?

10  A.    No, my normal practice would be, well, as far as I know,

11  my practice as always been that if a client asks for an appeal,

12  that I would file one.  But I can't say that Dan did not say

13  those things to me because as I'm sitting here, I have no

14  independent memory of -- I know I talked with Dan after the

15  sentencing, because we always do.  Just, if for nothing else,

16  just saying good luck with your sentence, hope things go well

17  for you.  So I'd be pretty confident that we had at least some

18  discussion at counsel table after the sentencing.  But I have

19  no independent memory at all what was discussed.

20  Q.    From the standpoint of your recollection, prior to this

21   resentencing, as you did before the original sentencing, did

22   you discuss with Daniel Hines what might happen at the

23   resentencing and what the issues would be and the likelihood of

24   an appeal or the propriety of an appeal after the resentencing,

25   since you were already successful once in the Third Circuit?


30


1   A.   Well, I believe when I testified earlier, I said I could

2   not recall whether or not I had talked with Dan before even the

3   original sentencing about what would happen based on the

4   outcome of the sentencing.  I just testified that would be

5   something that would commonly happen with clients.  I don't

6   have any -- I know I met with Dan before the resentencing,

7   after he got brought back to the Erie County Prison by the

8   Marshals for the resentencing, I'm confident that I met with

9   him over there to talk about the resentencing.  But as far as

10   the details of that conversation and whether or not we talked

11   about appellate rights in that conversation, I have no memory.

12   Q.   But it is contrary to your common practice that when

13   someone tells you that they'd like an appeal to be filed, for

14   you not to file an appeal?

15  A.    Yes, if someone asks me to file an appeal, I have never,

16  at least not knowingly, ever failed to file an appeal.

17  Q.    Now, Mr. Hines also testified that his mother called you

18  approximately six months after the original sentencing and

19  asked you or discussed with you why you hadn't filed the

20  appeal.  Do you recall having that telephone conversation with

21  Mr. Hines' mother?

22  A.    I recall having a number of phone conversations with

23  Dan's mom after -- well, throughout my entire representation of

24  Dan.  But even after the resentencing, I recall having

25  conversations with her.  I don't recall if we talked about an


31


1  appeal or a lack of an appeal.  I remember talking about some

2  subjects with her, I don't remember talking about that

3  particular subject.

4  Q.    What subjects?

5  A.    There was a motorcycle that had been seized during the

6  search of the residence where Dan and Ms. Munnings were living.

7  They were just having a very hard time getting that motorcycle

8  released back to them from the Pennsylvania State Police.  So I

9   talked with Ms. Hines about that a number of times.  Actually,

10  I talked with the Pennsylvania state trooper, at least once,

11  about that issue.  So I recall talking with her about that.  I

12  don't recall talking to her about an appeal, why one wasn't

13  done.  That certainly is possible that we did that, I just

14  don't recall that.

15  Q.    Counsel, if six months after a resentencing, if you, on

16  your own, found out from a client's mother that he was

17  indicating that you failed to file an appeal that he requested

18  be filed on his behalf.  First of all, does that appear to be

19  something that would stick in your mind, would it concern you

20  that a mother was calling, asking you or challenging you why

21  you didn't file an appeal on behalf of her son when he asked

22  you to do so?

23  A.    Not necessarily, because I have a lot of conversations

24  with family members about why or why not, or why particular

25  things were or were not done in a case.  And in a lot of those


32


1   conversations there's been misunderstandings between, or

2   there's certainly been a difference between what I talked with

3   the client about and what the family member thinks happened.

4   Usually when I got a call like that, I will explain, to the

5   extent I can, why something was or was not done.  Obviously,

6   without being able to get into any detailed discussions of

7   conversations I had with the client.

8   Q.    Was Mrs. Hines like that, you're talking about people who

9   called and complained about actions that weren't taken, wasn't

10  she still seeing you as the attorney for her son and she was

11  looking for your help to get the motorcycle back?

12  A.    She was looking for advice on how to get the motorcycle

13  back.  I had explained to her I didn't represent Dan or herself

14  or her husband with regard to the motorcycle, I wasn't going to

15  represent them in some kind of legal action against the state

16  police to try and get the motorcycle back.

17  Q.    But your relationship with the Hines family was such that

18  even knowing that you were someone who they would turn to to

19  ask those questions, they're not lawyers?

20  A.    No, they're not.

21  Q.    You had a decent enough relationship with them that six

22  months after the man is sentenced, she felt comfortable calling

23  you concerned about the motorcycle.  Did you have a decent

24  relationship with Mrs. Hines?

25  A.   Yes, I believe so.


33


1  Q.   Was she the type of client who was calling complaining to

2  you about things that had not been done?

3  A.   No, she was always very nice on the telephone.  Even when

4  she was asking, if she would ask a question, she was always

5  very pleasant.

6  Q.   But the reason why I'm asking the question, counsel, when

7  I asked you whether she had had this conversation with you and

8  whether or not it would stick in your mind, you kind of

9  recalled back to other clients who would call and family

10  members who would call and complain about things that weren't

11  done.  I'm asking you whether Mrs. Hines was that type of

12  family member to a client, who was regularly calling you

13  complaining about your representation of their son?

14  A.   No, I didn't see her as calling and complaining about the

15  representation.

16  Q.   Now, if you received information directly from a client's

17  family member about a serious claim that you failed to file an

18  appeal that was requested, and they're waiting for the appeal

19  you're supposed to file and you were concerned that you may

20  have not filed the appeal, wouldn't you report that to your own

21  office or to the court?

22  A.    No, because if she called me six months after the

23  sentencing, no notice of appeal can be filed once you're

24  outside the 10 days, that's it.  Most likely what I would do is

25  inform them that it's impossible to file a notice of appeal at

34

1  this point.  But I have routinely told my clients or family

2  members that if they are unhappy -- they think I didn't perform

3  adequately, they can file a 2255 motion.  I'm not saying that I

4  said that to Mrs. Hines, as I said, I don't recall talking to

5  her about that issue.  That would be what I would normally do

6  under that situation.  Contacting the court, there isn't

7  anything that can be done at that point in time to try and get

8  an appeal filed.

9  Q.    With regard to the particular facts of this case, having

10  litigated the issue in front of Judge McLaughlin, having taken

11  testimony on the weapons enhancement and having understood his

12  findings with regard to the weapons enhancement, did this seem

13   to be the type of situation, after a resentencing, after a

14   successful appeal, that you found there to be a rational basis

15   to file an appeal?

16   A.    Well, based on Judge McLaughlin's factual findings with

17   regard to the gun, I certainly wouldn't characterize this as

18   being one that would likely be a winning argument on appeal.

19   The flip side is I don't think it would be a frivolous appeal

20   to challenge the gun enhancement.  My understanding of it,

21   number one, Judge McLaughlin made a credibility finding with

22   regard to DEA Agent Petyak's testimony about where firearms

23   were found in the house.  And then made a finding that the gun

24   was present.  My understanding is that would be a review for

25   abuse of discretion on appeal, which would be a tough argument

35

1   to win.

2   Q.    Now, with regard to, it seems to me today that you don't

3   recall having any type of conversation or the content of it,

4   did Daniel Hines in any way reasonably represent to you, that

5   you can recall today, that he wanted to appeal again?

6   A.    As I said, I don't have any recollection talking to Dan

7   about appeal rights.  I'm not saying it did happen, I'm not

8   saying it didn't happen, I'm saying I don't have any memory of

9   it, when I'm sitting here over a year later.

10  Q.    Fair enough.  Now, concerning the impact that the weapons

11  enhancement had on Mr. Hines service of his sentence; how long

12  have you been a Federal Public Defender?

13  A.    A little over 10 years.

14  Q.    Both here in the Western District of Pennsylvania and

15  also in the Midwest?

16  A.    Yes.

17  Q.    In the course of your representation of clients, have you

18  made yourself aware of the various programs available through

19  the federal prison program and the ways in which or the things

20  that occurred at sentencing that may impact the programs that

21  your clients can engage in?

22  A.    Yes, I've tried to.

23  Q.    And oftentimes you find yourself advocating to the court

24  concerns you have with regard to either locations or the types

25  of programs that your clients can benefit from in the federal

36

1  prison system?

2  A.   Yes.

3  Q.   In this particular case, were you aware at the original

4  sentencing any impact that the weapons enhancement would have

5  on Mr. Hines's ability to receive drug treatment?

6  A.   At the original sentencing -- I can't recall if I did or

7  I didn't.  I mean, I know in general if you're convicted of a

8  violent offense or if you have any prior convictions for any

9  offense that the Bureau of Prisons considers violent, you're

10  not going to be able to get any reduction in your sentence if

11  you take the drug program that the Bureau of Prisons offers.

12  Q.   You were clearly aware of that at the resentencing

13  because you actually discussed the matter with Judge McLaughlin

14  on the record?

15  A.   Well, briefly before I was called to the stand, you had

16  indicated to me that that was discussed at the resentencing.

17  So if that's the case, obviously, that was something --

18  Q.   Do you recall it being Mr. Hines that described for you

19  the impact that the weapons enhancement has on a federal

20  prisoner or is that something you knew or figured out on your

21  own?

22  A.   I can't say for sure -- that I knew that the gun

23  enhancement would prevent him from getting the benefit of that

24  program.

25        THE COURT:  Just so I'm clear, is it the gun


37


1  enhancement that would prevent him from getting credit for

2  participating in the program or prevent him from participating

3  in that program at all, do you know?

4        THE WITNESS:  My understanding and it could be

5  wrong, but my understanding is if you have either a conviction

6  or the gun enhancement, the Bureau of Prisons would let you in

7  the drug treatment program, but you wouldn't get any time cut,

8  that's my understanding, it's quite possible that that's wrong.

9  Most of my client's interest is whether or not they're going to

10  get the reduction in time.  So I try to let them know about

11  whether or not they're qualified for that.  But I can't say --

12  I knew for sure -- if Dan would have told me about that, I

13  can't say for sure I knew about that before he told me or not.

14  BY MR. PICCININI:

15  Q.   Do you recall having any specific conversations with him

16  about that subject?

17  A.    I can't tell you that I have a specific recollection of

18  talking to him about that.

19          MR. PICCININI:  Your Honor, that's all the questions

20  I have at this time.

21          THE COURT:  Mr. Mead.

22                  CROSS-EXAMINATION

23  BY MR. MEAD:

24  Q.    Mr. Patton, I'm correct that you're the only Assistant

25  Federal Public Defender in the Erie area?


                            38


1  A.    That's correct.

2  Q.    Approximately, how many cases do you have a year?

3  A.    Well, it's increased every year since I've been here.  In

4  the last fiscal year that ended in September, we closed, I

5  think it was 125 cases for that fiscal year.  But that included

6  kind of an artificial bump up because we had a number of Habeas

7  cases on one particular issue.  So if you kind of took that out

8  of the mix, they were all really combined, but we got

9  individual stats for each one, probably close to 80.

10  Q.   Eighty did you say?

11  A.   Yes.  But that's the highest we've ever been.  Every year

12  it's gone up.

13  Q.   Now, directing your attention back to the second

14  resentencing, am I correct that your testimony is that you

15  don't recall having any discussion with Dan about an appeal one

16  way or the another?

17  A.   That's correct.

18  Q.   So if he testified that he did say to you, hey, I want to

19  try it again, you would not dispute that, correct?

20  A.   I just don't have any memory discussing the issue with

21  him one way or the other.

22  Q.   Was he upset at the time of that sentencing, do you

23  recall?

24  A.   I wouldn't -- I wouldn't say that he was upset, no, Dan

25  was always very -- he was a very easy client to work with.  And


39


1  we knew going into the resentencing that there was a good

2  chance that he'd end up with a sentence that was close to the

3  original, if not the same sentence.

4  Q.   And at the resentencing, am I correct that you at the

5  beginning of the resentencing, and I have the transcript, I

6  know this is a year ago, I'm happy to show you the transcript

7  to refresh your memory, do you recall continuing to object to

8  the two-level enhancement for the firearm?

9  A.   It's my recollection of that at the resentencing I told

10  the judge that we were still objecting to that, but we didn't

11  have any different or new evidence to present on the issue.  My

12  memory of it was that Judge McLaughlin indicated that his

13  ruling on that issue was going to be the same as the original

14  sentencing.

15       MR. MEAD:  Again, it's not a memory test, that's

16  fairly accurate, your Honor.

17       THE COURT:  That is accurate, I read the transcript

18  this morning.

19  BY MR. MEAD:

20  Q.   Do you also recall, Mr. Patton, that you discussed the

21  fact that if Mr. Hines went into the federal drug treatment

22  program, because of this finding there were firearms involved

23  in the offense, he would not receive a reduction, do you recall

24  discussing that?

25  A.   I actually don't, Mr. Piccinini had mentioned that to me

40

1  before the hearing.

2        MR. MEAD:  May I show him the transcript, your

3  Honor?

4        THE COURT:  Sure.

5        MR. MEAD:  I know it's not a memory test, but I just

6  want to put that on the record that's what you did.

7        THE COURT:  What's he looking at?

8        MR. MEAD:  He's looking at page 15, your Honor, in

9  which he makes the argument to the court that if there is no

10  finding of the gun, then Mr. Hines is eligible for the program,

11  for a reduction.

12        THE COURT:  For a reduction?

13        MR. MEAD:  Correct.

14        THE WITNESS:  Yes, I see that, where I argue to the

15  judge that if Dan got the gun bump, that while he may be able

16  to participate in the drug program, he would not get a

17  reduction in sentence.

18  BY MR. MEAD:

19  Q.    And I believe your testimony was you don't recall if you

20  raised that argument because you knew about it or because Mr.

21  Hines brought it to your attention?

22  A.    Well, Mr. Piccinini had asked me if I knew about that

23  fact before Dan's resentencing or was Dan the one who brought

24  that up, I don't know either way.  Based on the transcript -- I

25  can't say I have a clear memory of talking about it, but it

41

1  sure seems to me that's something Dan and I had probably talked

2  about before the resentencing.

3  Q.    Now, after the resentencing, did you have any contact

4  with Mr. Hines, either by letter or phone conversation at any

5  point after the resentencing?

6  A.    Not that I can recall.

7  Q.    And you testified that you did have several conversations

8  with Mrs. Hines, but you just can't recall the gist of them,

9  outside the motorcycle?

10  A.    Yes, the motorcycle sticks in my mind because I had a lot

11  of conversations with her about that.

12  Q.    But no independent recollection about any conversations

13  about an appeal?

14  A.   That's correct.

15  Q.   And you mentioned before that in the first appeal, was

16  the gun enhancement appealed in the first appeal?

17  A.   Well, I went back and looked, and what it appears to be

18  is that was a point in time where the Third Circuit was

19  basically, had been putting a stay on any case that was filed

20  that was raising a Blakely issue, because the Supreme Court at
                    _____

21  the time had the Booker case pending.  And the order from the
                    _____

22  Third Circuit remanding for resentencing refers to a letter

23  received from our office that the Third Circuit was going to

24  treat as an unopposed motion for resentencing based on the way

25  the Third Circuit had decided to handle any pending sentencing


                              42


1  case that had a Blakely issue.  So nothing on the merits was
                    _____

2  ever briefed to the Third Circuit.

3  Q.   And the Third Circuit didn't decide anything on the

4  merits on that issue?

5  A.   That's correct.

6  Q.   All right.  And, again, according to your testimony and

7  based on your experience of over 10 years as an Assistant

8  Federal Public Defender, you did not believe it was a frivolous

9  issue, correct?

10  A.   That's correct, yes.

11        MR. MEAD:  That's all I have, your Honor.

12        THE COURT:  Do you have anything else?

13        MR. PICCININI:  Yes, your Honor.

14             REDIRECT EXAMINATION

15  BY MR. PICCININI:

16  Q.   Counsel, with regard to the real impact of this

17  particular weapons enhancement from a sentencing standpoint, do

18  you recall that regardless of weapons enhancement in this case

19  and regardless of the Sentencing Guidelines, this was a case

20  where there was a 120 month or a 10-year mandatory sentence?

21  A.   Yes, I recall that, that's what I argued for at the

22  resentencing.

23  Q.   That any increase above the 120 months wasn't necessary

24  to meet the needs of sentencing, so you knew at the time 120

25  was it, Mr. Hines knew that a 120 months was the mandatory

43

file:///A|/HINESEVD.TXT

1  minimum?

2  A.   Yes.

3        MR. PICCININI:  That's all I have, your Honor.

4        MR. MEAD:  Nothing further, your Honor.

5        THE COURT:  Mr. Patton, with respect to -- has it

6  ever been your practice to file an appeal without consultation

7  with your client?

8        THE WITNESS:  No.

9        THE COURT:  Mr. Hines testified, as I think was

10  phrased in a question by Mr. Piccinini, that immediately after

11  the second sentencing, he said let's try it again.  Is it you

12  have no recollection of the conversation at all or is it that

13  your best recollection is that that conversation never

14  occurred?

15        THE WITNESS:  That I have no recollection at all.

16        THE COURT:  In other words, would it be accurate

17  from my standpoint, when you say I don't recall the

18  conversation, I should not construe from that the likelihood

19  that it did not occur?

20        THE WITNESS:  Correct.

21        THE COURT:  You simply don't know one way or the

22 other?

23     THE DEFENDANT:  I'm not saying that you should

24 conclude that it did occur or that it did not, I just don't

25 remember.


44


1     THE COURT:  All right.  Thank you, very much.

2     MR. PICCININI:  Your Honor, if I could follow-up on

3 one of the questions you had here.

4         FURTHER REDIRECT EXAMINATION

5 BY MR. PICCININI:

6 Q.   Mr. Patton, with regard to your consultation with clients

7 on the issue of whether to appeal, if there is a non-frivolous

8 issue that could be appealed, would you file an appeal on

9 behalf of your client even if you thought the likelihood of

10  success wasn't great, as long as it was not frivolous?

11 A.   Sure.  Even if it's frivolous, we have to file the notice

12 of appeal.

13 Q.   Because the request is made by your client?

14 A.   Right.

15     MR. PICCININI:  All right, that's all I have, your

16  Honor.

17      MR. MEAD:  No further questions, your Honor.

18      THE COURT:  Thank you, Mr. Patton.

19      MR. MEAD:  Your Honor, Mrs. Hines is in the

20  courtroom, I would like to call her just for that one issue

21  that has come up.

22      THE COURT:  All right, have her come up.

23      DEPUTY CLERK:  Can you state your full name for the

24  record?

25      THE WITNESS:  Mary Ann Hines.


45


1       DEPUTY CLERK:  Raise your right hand, please.

2       MARY ANN HINES, DEFENSE WITNESS, SWORN

3           DIRECT EXAMINATION

4  BY MR. MEAD:

5  Q.   Ma'am, please state your name?

6  A.   Mary Ann Hines.

7  Q.   Remember to speak into the microphone, if you can.

8  Mrs. Hines, are you the mother of Dan Hines, who is in the

9  courtroom here today?

10  A.   Yes, I am.

11  Q.   One of the issues that came up, Mrs. Hines, involved

12  conversations that you had with Mr. Patton; do know who Mr.

13  Patton is?

14  A.   Yes, I do.

15  Q.   Keep your voice up.  And that was your son's lawyer,

16  correct?

17  A.   Yes.

18  Q.   Do you recall ever having a conversation with Mr. Patton

19  involving whether or not an appeal had been filed?

20  A.   Yes, I do.

21  Q.   Why did you contact Mr. Patton about whether an appeal

22  had been filed?

23  A.   Because Dan asked me to.

24  Q.   And at that point did you contact Mr. Patton?

25  A.   Yes, I did.


46


1  Q.   And what did you say to Mr. Patton?

2  A.   I asked him if he had filed an appeal for Dan.  And he

3  told me no, that he didn't.  I said well, why because Dan

4    thought you were.  He said well, because it wouldn't be worth

5    it, he said it wouldn't do him any good.

6    Q.    Do you recall when this conversation occurred?

7    A.    I'm thinking that it might have been in the spring, early

8    part of summer.  I think between March and April sometime.

9    Q.    You don't have a specific recollection of the date?

10   A.    No, I don't.  I just know that it was still really cold

11   and snowy out.  So it has to be probably sometime in March,

12   later part of March, first part of April.

13   Q.    Did you then inform your son of this conversation?

14   A.    Dan called me, he always calls me on Monday, Wednesday

15   and Fridays.  And he asked me if I called Mr. Patton, and I

16   said yeah.  He says am I getting an appeal, and I said no, Mr.

17   Patton said he didn't file one because he felt it wouldn't be

18   worth it.

19   Q.    What was Dan's reaction?

20   A.    Very upset.

21          MR. MEAD:  That's all I have, your Honor.

22          THE COURT:  All right, Mr. Piccinini.

23                    CROSS-EXAMINATION

24   BY MR. PICCININI:

25  Q.    Ma'am, was that the only conversation you had with Mr.

47

1  Patton when you called him in what you believe was late March,

2  early April?

3  A.    You mean just that particular thing?

4  Q.    That particular issue?

5  A.    Yeah.

6  Q.    How about the motorcycle that you discussed with Mr.

7  Patton on several occasions, did you bring up that issue?

8  A.    On that same day -- I don't remember.  I know I called

9  him different times to getting his advice on what I should do

10  next because they just wouldn't release it to me.  So he said

11  if it was him, he would get a lawyer, and get the bike back for

12  me.  So that's what I did.

13  Q.    In your conversations with your son prior to March or

14  April, would you agree with me that you called Mr. Patton

15  directly after close in time to when your son told you to call

16  Mr. Patton?

17  A.    That's right.

18  Q.    You didn't wait several months to call Mr. Patton about

19  that issue?

20  A.    When Dan told me is when I called.

21  Q.    And you would agree with me that prior to March and

22  April, from September, October, November, December, January,

23  February, that at no point in time did your son discuss with

24  you that he had asked Mr. Patton to file an appeal, isn't that

25  true?

48

1  A.    Can I say something?

2         THE COURT:  Answer the question first.  Repeat the

3  question, please.

4  BY MR. PICCININI:

5  Q.    Would you agree with me that from the time that he was

6  sentenced in August, so that would be September, October,

7  November, December, January, February, you would agree with me

8  that at no time during that period, did your son tell you that

9  Mr. Patton was supposed to file an appeal on his behalf?

10  A.    Dan talked to me different times about it, so I would

11  have to say yes, he felt Mr. Patton did.

12  Q.    About what?

13   A.   Filing an appeal.

14   Q.   When did he start talking to you about it?

15   A.   Dan has always talked about it, from the last time he got

16   his sentence.  So then finally he didn't get anything, he said,

17   mom, will you call Mr. Patton and ask if my appeal was filed.

18   Q.   Why didn't you call him months earlier if Dan was telling

19   you --

20   A.   Dan didn't ask me to until that particular time, he was

21   just waiting for it to happen.

22   Q.   Well, if you had several conversations with Mr. Patton

23   about the motorcycle incident, all before March and April,

24   would you agree with me that you talked with Mr. Patton on a

25   lot of occasions about that motorcycle?


49


1   A.   Uh-huh.

2   Q.   At the same time you're indicating now that your son told

3   you he was supposed to have an appeal filed, how come you

4   didn't bring up the appeal in all your conversations with Mr.

5   Patton about the motorcycle?

6   A.   I don't know, I just thought he was working on it.

7   Q.   Wouldn't he have told you something about the appeal?

8   A.   Danny?

9   Q.   No, Mr. Patton, in your conversations with him?

10  A.   No, he wouldn't because that's not what I was addressing.

11  Q.   Did your son tell you about the filing of this, what's

12  known as a motion to vacate sentence, a Habeas petition that he

13  filed, did he tell you that he was doing that?

14  A.   You mean that he did himself, yes.  I know he was doing

15  it, he started that after Mr. Patton told me he didn't.

16  Q.   How did your son tell you that he knew about the filing

17  of this thing?

18  A.   He found out from where he's at, he got help there.

19  Q.   What did he tell you he hoped to do by filing this

20  motion?

21  A.   Get the gun enhancement taken off so he could go to the

22  drug program.

23  Q.   He told you specifically about the benefits he would get

24  with regard to the drug program?

25  A.   Yes.  Dan told me that if he could get this gun

50

1  enhancement off, he would get, to be able to get more time off

2  for the drug program.

3  Q.   Did you review, did he send it to you in any regard to

4  look at it?

5  A.   No, I never saw it.

6  Q.   When Mr. Patton was representing your son prior to him

7  being convicted, did you stay in touch with Mr. Patton

8  throughout the entire case?

9  A.   Most of the time.  If Danny would like have a question or

10  whatever, he would have me call Mr. Patton.  But I tried not to

11  bother him much because, you know, he is busy.  He'd either be

12  out and I'd have to talk to his secretary or something like

13  that.

14  Q.   Mr. Patton was responsive to your questions, he was the

15  type of attorney who worked hard on behalf of your son?

16  A.   Yes, he did, we were happy with him.

17  Q.   Do you remember after the first sentencing when your son

18  got 140 months?

19  A.   I remember.

20  Q.   And were you part of any discussions that an appeal would

21  be filed after he got the 140 months?

22  A.   Yes.

23  Q.    And do you recall that the appeal was filed very quickly

24  after that sentencing?

25  A.    I know.


                                    51


1   Q.    And Danny got notice of that, didn't he?

2   A.    Yes.

3         MR. PICCININI:  That's all I have, your Honor.

4         THE COURT:  All right, anything else?

5         MR. MEAD:  Just one point.

6                   REDIRECT EXAMINATION

7   BY MR. MEAD:

8   Q.    Did you testify that in your conversations with Dan after

9   the resentencing, he was under the impression that an appeal

10  had been filed, correct?

11  A.    Yes.

12  Q.    So he had thought Mr. Patton had filed an appeal for him

13  after the second sentencing?

14  A.    Yes.

15  Q.    It was only as time went on that he asked you to inquire

16  about it?

17  A.    Right, he'd just say well, I hope my appeal goes through.

18  I thought actually it was being worked on.

19        MR. MEAD:  Thank you, that's all I have.

20        THE COURT:  Thank you, ma'am, you can step down.

21        MR. MEAD:  I have nothing further, your Honor.

22        MR. PICCININI:  Your Honor, I do have one issue, I

23  don't know if it's relevant to your decision making today.  The

24  content of this file has been turned over to current defense

25  counsel.  In light of the defendant's testimony, I think Mr.


52


1  Patton is correct, that I wanted information concerning the

2  appeal of the resentencing.  But the claims about how long the

3  defendant waited before filing the Habeas, talked to his

4  mother, and his claims the first time he appealed it was months

5  and months before he got the documentation, it seems to me

6  information that would be refuted by the record.

7        THE COURT:  Do you want to look at the file?

8        MR. PICCININI:  Yes, I'd like to see what's in

9  there.  And I also wonder, to the extent because we now hear

10  today that there were conversations with the mother, whether

11   there's any phone records or documentation concerning phone

12   calls with the mother that counsel, Mr. Patton, would not have

13   known are relevant today.

14        THE COURT:  Do you have the file, Mr. Mead?

15        MR. MEAD:  I do, your Honor, it's in my office.  I

16   could go get it and bring it back.

17        THE COURT:  How big is it, is it a thick file?

18        MR. MEAD:  It's fairly thick, I picked it up last

19   night.  Now, a lot of it won't be relevant, a lot of it

20   involves another drug case, I believe, there are search

21   warrants, things like that in the file.  I don't know how much

22   is really relevant, but it's a fairly big file.

23        THE COURT:  All right, let's do this, let's recess

24   until 11:15.  That will give you an opportunity to get the file

25   to him.  Do you want to say something, Mr. Patton?


53


1         MR. PATTON:  Well, your Honor, obviously, I'm not a

2    party here, but this is part of the file from our office that's

3    involved here.  I understand the point that Mr. Piccinini is

4    making, I don't believe he needs to review the entire file.

5          THE COURT:  Neither do I.

6          MR. MEAD:  Your Honor, could we have Mr. Patton

7   review the file, that might be easier.

8          THE COURT:  I suspect that there's 98 percent or 99

9   percent of that file is completely irrelevant.

10          MR. PICCININI:  Your Honor, if I could be heard on

11   this.  Mr. Hines cannot have it both ways.  Nor should Mr.

12   Patton be the one reviewing the file for the government's

13   determination as to what's relevant to us defending Mr.

14   Patton's ineffectiveness.  Mr. Hines has clearly waived the

15   attorney-client privilege with regard to this matter.  Any

16   notes or files or documents, I'm not interested in looking at

17   the search warrants.  I'm interested in anything in that file

18   that is relevant to Mr. Hines' current claim that he appealed.

19   And information related to the history of this particular

20   appellate process.  Because Mr. Hines testified directly to

21   when he got notice, how he had received notice the first time

22   around.  There's now a claim that there were phone

23   conversations.  We know that there are e-mails where this

24   matter was discussed.  There are some claims with regard to Mr.

25   Hines having to describe for Mr. Patton the ramifications of

1  the weapon enhancement.  And Mr. Patton just doesn't recall a

2  lot of those details, and recognizably so.  But Mr. Hines just

3  can't have it both ways, judge.  If he's going to claim

4  ineffectiveness of counsel, then he's waiving the

5  attorney-client privilege with regard to the content of that

6  file.  I'm not interested in anything else other than this

7  particular case.  But I ought to be able to see the documents

8  to decide if on behalf of the government whether or not the

9  documents are relevant.

10      MR. PATTON:  You may have found he has waived the

11  privilege with regard to the issue in this case, whether or not

12  there was a request for an appeal.  I don't think that

13  necessarily equates to a finding he waived the attorney-client

14  privilege on a blanket waiver.

15      THE COURT:  He has waived the attorney-client

16  privilege on any document which could circumstantially support

17  or not his position that the conversation occurred, the way

18  that he said it occurred.  Now, I have no idea what's in the

19  file.  But you do, Mr. Patton, you put it together.

20  Specifically, you are looking for any correspondence.  See,

21  this is why it's impossible to speculate what's there, if you

22  don't know what's there.

23        MR. PATTON:  I believe there's a separate file for

24  the first sentencing.  Because that was not handled by me, that

25  was handled by Ms. Gerlach out of the Pittsburgh office.  And

55

1  so there's a part of the file that's all stuff from my original

2  representation of Dan, all the way through the first

3  sentencing.  Separate within there is a separate folder, that

4  has the stuff from the first sentencing.  Then there's a folder

5  that has the stuff for the resentencing.  And actually copies

6  of the e-mails didn't come out of the paper file, we went back

7  through -- that was just saved on the computer.  That wasn't a

8  piece of paper that existed in the files.  It was a sent e-mail

9  that was in memory.  But I understand what Mr. Piccinini is

10  looking for and I understand you found he waived the

11  attorney-client privilege with regard to this issue and

12  anything in the file that is relevant to this issue, but I

13  don't believe turning the entire file over to the U.S.

14    Attorney's Office, for them to look through the whole thing, is

15    the appropriate way to determine whether or not there is

16    something responsive to the particular issue.

17            THE COURT:  Well, you're the custodian of the file

18    right now, what do you say?

19            MR. MEAD:  Your Honor, I looked through the file,

20    there's no smoking gun in there.  Honestly, on the one hand I'm

21    saying look at it, I don't care.  On the other hand, I

22    understand Mr. Patton position, he doesn't want to start a bad

23    precedent.  But as far as this client is concerned here today,

24    I don't have a problem because there's nothing in there that's

25    going to hurt us.  That's how I feel.  But, again, I understand


                                56


1    Mr. Patton's position because he doesn't want a bad pattern.

2            MR. PICCININI:  Your Honor, Mr. Patton is a fact

3    witness here today, he doesn't have a dog in this fight at all.

4    The privilege is Mr. Hines', not Mr. Patton's.  Mr. Hines has

5    waived the privilege by setting forth counsel's

6    ineffectiveness.

7            THE COURT:  The privilege is Mr. Hines to waive or

8   not. But this is the way to solve this, although, I thought

9   largely it had already been solved.  Mr. Mead, to the extent

10  that there has not already been a waiver and I think that there

11  has been a waiver for the reasons I previously put on the

12  record, does your client consent to Mr. Piccinini's review of

13  his file for the reasons stated on the record by Mr. Piccinini?

14         MR. MEAD:  May I consult, your Honor?

15         THE COURT:  Yes.

16         (Discussion held off the record between the

17  Defendant and Defense Counsel.)

18         MR. MEAD:  My client is willing to waive it, your

19  Honor.

20         THE COURT:  All right.  Produce the files to him and

21  as soon as you're done reviewing them, if you can get it done

22  by 11:15 or thereabouts, we'll conclude this.

23         (Recess from 10:22 a.m.; until 11:05 a.m.)

24         THE COURT:  Mr. Piccinini.

25         MR. PICCININI:  Your Honor, I have reviewed the file

57

1   and I would request the opportunity to recall Attorney Patton

2   to the stand with regard to the documents I found in that file.

3        THE COURT:  All right.

4        THOMAS W. PATTON, GOVERNMENT WITNESS, PREVIOUSLY SWORN

5                  DIRECT EXAMINATION

6   BY MR. PICCININI:

7   Q.   Mr. Patton, I've had the opportunity to review the Public

8   Defender's file and there are several documents that I wanted

9   to present to you and ask you questions about, that have become

10  relevant to today's hearing.

11       MR. PICCININI:  First of all, I've already marked

12  Government Exhibit 1, I would ask for the admission into

13  evidence of Government Exhibit 1.

14       THE COURT:  It's admitted.

15  BY MR. PICCININI:

16  Q.   It's a previous e-mail communication between your office

17  here in Erie and your Pittsburgh office concerning an e-mail

18  that you sent to the Pittsburgh office or had sent to your

19  Pittsburgh office concerning the fact that there would be no

20  appeal taken after Daniel Hines' resentencing.  Do you recall

21  that?

22  A.   I recall the exhibit.

23  Q.   Just going through the file with regard to the original

24  sentencing, let me show you what I have marked as Government

25  Exhibit 2 for identification.  Can you identify Government


58


1  Exhibit 2?

2  A.    This is a copy of -- actually a series of e-mails, with

3  the original e-mail being replied to and that reply being

4  replied to.  The original e-mail was sent by Elizabeth Durkin,

5  my secretary, on 11/24/04, stating that "we've had the

6  following sentences recently in Erie.  Karen, I believe Tom has

7  talked to you about the ones which need appeals; Linda, I gave

8  you the case number of these, too.  I'll be sending the files

9  down to Pittsburgh for Hines," and there was another case.  And

10  then it lists the sentencings that have occurred, the case

11  name, sentencing date.  The date that judgment was docketed,

12  that starts the 10 days for the filing of the notice of appeal.

13  And then a column whether or not there will be an appeal.

14  Within that is an entry for Daniel Ray Hines with a 11/22/04

15  sentencing date, unknown for the date that the judgment was

16  docketed.  And then stating yes, as to whether or not there

17  would be an appeal.  Then states "I'll put a copy of this in

18   the respective files.  Let me know if you need any more info in

19   the meantime."

20   Q.    All right.  Let me show you the original of the document

21   that I obtained from your file, and reviewing both Government

22   Exhibit 1 and the document I've obtained from your file, which

23   I'm not going to mark as an exhibit, does it appear that I've

24   redacted sections of Government Exhibit 2 from the original

25   that referred to other particular defendants?

59

1   A.    That's correct.

2   Q.    And as you review the unredacted version, is it accurate

3   to say, just from a policy standpoint that, as you testified

4   earlier concerning your procedure at the resentencing, after

5   the original sentencing, it was the policy for your office to

6   send an e-mail from Erie to your appellate division in

7   Pittsburgh setting forth whether or not an appeal should be

8   filed or would be filed in a particular case?

9   A.    I'm sorry, is that consistent with my prior testimony?

10   Q.    No, is that consistent -- it is your office's policy to

11   send an e-mail from Erie to Pittsburgh and list for them recent

12  sentencings and whether appeals should be filed?

13  A.   Yes.

14  Q.   And as you testified earlier with regard to the e-mail

15  that was sent after the resentencing, Government Exhibit 2, is

16  a redacted version of the e-mail that was sent concerning the

17  original sentencing?

18  A.   That's correct.

19  Q.   And on this particular document, Government Exhibit 2,

20  although, on the first page it's kind of a chart form, it says

21  case name, sentencing date, date judgment is docketed, and an

22  appeal with two question marks next to it.  Underneath that

23  would be the list of the defendants' names, the judgment date,

24  the sentencing date, and in words yes or no as to whether an

25  appeal would be filed?

60

1  A.   That's correct.

2  Q.   In this particular instance, is it accurate to say on

3  this date, which was November 24, 2004, you sent to your

4  Pittsburgh appellate division a list of four defendants' names?

5  A.   Correct, my secretary, Elizabeth Durkin did.

6  Q.    And with both the sentencing dates, the judgment dates,

7  and then next to it there were two defendants for which appeals

8  would be filed, and two defendants where it was written no

9  where appeals would not be filed?

10  A.    That's correct.

11  Q.    After the first sentencing, there was a yes with regard

12  to Mr. Hines' sentencing?

13  A.    That's correct.

14  Q.    Or excuse me, appeal.

15        MR. PICCININI:  Your Honor, I would request the

16  admission into evidence of Government Exhibit 2.

17        THE COURT:  It's admitted.

18  BY MR. PICCININI:

19  Q.    Now, in addition, with regard to the procedures that are

20  employed from your office after a particular sentencing, you

21  indicated and you testified earlier that some sort of notice or

22  letter would be sent to a defendant if an appeal was filed on

23  their behalf; do you recall that testimony?

24  A.    Yes, I believe I testified that I couldn't say exactly

25  what our Pittsburgh office would do, but if it was an appeal I

1  was going to handle out of the Erie office, we would send a

2  copy of the notice of appeal that had been filed in the case to

3  the client at the time the notice of appeal was filed.

4  THE COURT:  Just as a matter of clarification, are

5  the actual, for instance, on a case like Mr. Hines or any other

6  case that you would have handled here, but then is referred

7  down there, would the actual notice of appeal be filed by

8  Pittsburgh or would it be filed by you?

9  THE WITNESS:  It depends, your Honor.  Part of the

10  process we go through is once we see whether there are going to

11  be appeals or not, if there are going to be appeals, we then

12  kind of do some talking about who physically is going to handle

13  the appeal.  If Karen Gerlach or one of the other appellate

14  attorneys in Pittsburgh is going to physically handle the

15  appeal, they file the notice of appeal, so they can try and

16  time it with other cases that they're handling.  If I'm going

17  to handle the appeal, then my office in Erie would file the

18  notice of appeal.

19  THE COURT:  So you wouldn't just file one to toll it

20  and then let them handle the appeal, as a general proposition?

21          THE WITNESS:  As a general proposition, no, that's

22  not the way it would be handled.  Because they like to file the

23  notice of appeals in cases they're going to do, so that Karen

24  and her secretary can try and time the filing of the notice of

25  appeal to have as much control as they can over when the

62

1  briefing schedule is going to be.

2          THE COURT:  Then my last question is on the original

3  Hines sentence back on November 22nd, did you file the notice

4  of appeal?

5          THE WITNESS:  I don't recall, I believe Mr.

6  Piccinini actually has the notice of appeal.  I believe it was

7  filed by the Pittsburgh office.

8          THE COURT:  Go ahead.

9  BY MR. PICCININI:

10  Q.    Counsel, in that regard the sentence, the original

11  sentence of Mr. Hines occurred on November 22, 2004.  I'm going

12  to show you what I have marked as Government Exhibits 3 and 4,

13  if you could identify these.  First of all, Government Exhibit

14  3, does this appear to be a letter from your Pittsburgh office

15  to Mr. Hines?

16  A.    Yes, this is from the Pittsburgh office.  There is a

17  different letterhead that they use than the letterhead that we

18  use out of the Erie office.

19  Q.    What's the nature of this letter addressed and mailed to

20  Mr. Hines on December 1st of 2004, within 10 days of his

21  original sentencing?

22  A.    It's a letter, it's from Karen Gerlach.  Again, who is

23  the Assistant Federal Public Defender that's in charge of our

24  appellate division.  That basically is introducing herself to

25  Mr. Hines because she would not have before this point in time


63


1  had any contact with Mr. Hines.  The letter kind of lays out

2  how the appellate process will proceed with the filing of the

3  notice of appeal.  The filing of briefs.  And then the setting

4  of a tentative argument date, and then a notice as to whether

5  or not there actually will be an oral argument, which of course

6  would be up to the Court of Appeals.  That's what it explains.

7  Q.    This is your appellate division just identifying

8  themselves to the defendant within 10 days of the sentencing,

9   and do they attach to that what I would have marked as

10   Government Exhibit 4?

11   A.    Well, the letter doesn't say that there's an enclosure.

12   I don't know if it mentions it in the body --

13   Q.    Whether it's attached or not, I think it's not very clear

14   in here.  But is Government Exhibit 4, the notice of appeal

15   filed by Karen Gerlach in your Pittsburgh office on December 1,

16   2004?

17   A.    Yes, it's a copy of that.

18   Q.    So the date that the letter goes out to Mr. Hines is the

19   same date that the notice of appeal is filed?

20   A.    That's correct.

21   Q.    In your experience in the appeals that you've handled on

22   behalf of the office, would you send out a similar letter to a

23   defendant and give them a copy or at least notify them in some

24   way that an appeal has been filed?

25   A.    I would let them know that the notice of appeal was


64


1   filed.  It wouldn't be the same letter, I wouldn't have the

2   need to introduce myself to the client because I had already

3   represented them.  Generally, the letters I send out don't have

4   that general explanation of the appellate process because it's

5   somebody that I have personally handled their case, chances are

6   I've already talked with them, to give them a general outline

7   of how the appellate process would work.

8   Q.   After the original sentencing, what I've shown to you as

9   Government Exhibit 3 at least, is a copy of the correspondence

10  sent by the Federal Public Defender's Office to Mr. Hines after

11  the first sentencing?

12  A.   That's correct.

13  Q.   Now, do you recall sending any correspondence to Mr.

14  Hines or there being any correspondence sent to Mr. Hines from

15  the Public Defender's Office after the resentencing?

16  A.   I don't have any memory of doing that.  But I know that

17  you showed me a letter before I came up here that indicated

18  that we had sent him the amended judgment in the case, that

19  would be normal after any sentencing or resentencing.  My

20  office would send out a letter with the judgment enclosed.

21  Q.   In this case the resentencing occurred on August 2, 2005.

22  I'm going to show you what I have marked as Government

23  Exhibit 5 for identification, can you identify Exhibit 5?

24  A.   That is a letter dated August 10, 2005, from myself to

25  Mr. Hines, addressed to the Crawford County Correctional

65

1  Facility, stating that "enclosed is a copy of an amended

2  judgment with regard to your case."  With my signature.

3  Q.    And with regard to Government Exhibit 5, having read

4  through it, is there any reference in here to the appeal that

5  you would be filing on behalf of Daniel Hines, as he had

6  requested you supposedly to do on August 2, 2005?

7  A.    The letter does not refer to an appeal.

8        MR. PICCININI:  Your Honor, I would request the

9  admission into evidence of Government Exhibits 3, 4 and 5.

10       THE COURT:  They're admitted.

11  BY MR. PICCININI:

12  Q.    Mr. Patton, in the Public Defender's file or the

13  defendant's file in this case, there are several instances

14  where you received phone notes from various people for you to

15  return calls.  One from Special Agent Petyak concerning the

16  return of some items he has in evidence.  And specifically one

17  with regard to or from the defendant's mother.  Did you

18  specifically or did you regularly keep either phone notes from

19  calls that you were returning or notes of your conversations

20  with people when they called in about a particular case?

21  A.   I don't have any standard practice to taking notes of

22  phone calls.  Sometimes I'll write something down, it could be

23  on the back of a phone message slip or on a piece of legal pad,

24  sometimes I do, sometimes I don't.

25  Q.   And specifically with regard to Mrs. Hines, having

66

1  reviewed the fact that you had sent a notice or a letter to the

2  defendant giving him a copy of his judgment within 10 days of

3  his resentencing, does that refresh your recollection at all

4  with regard to any conversations you had with his mother where

5  she complained that an appeal hadn't been filed on her son's

6  behalf?

7  A.   No.

8  Q.   The same with regard to your discussions with the

9  defendant, if you had any discussions after his resentencing,

10  does the fact that you sent him this letter within 10 days of

11  his resentencing cause you to recall at all whether you had any

12  specific discussions with Mr. Hines where he made it clear to

13  you that he wanted an appeal to be filed?

14  A.    No.  But, you know, if we talked about an appeal and he

15  thought he asked me to do it and I didn't clarify that with him

16  one way or the other, then that's my fault for not clarifying

17  it with him.

18  Q.    Well, counsel, I heard you explaining that to Mr. Mead

19  before we came in, that you were explaining to Mr. Mead, as he

20  is prosecuting this action, explaining to him, so that he knew

21  for purposes of his argument today, that it's your

22  responsibility to clarify that with the defendant.  I know that

23  you likely have made sure that you're clear that you believe

24  that's your responsibility.  My question is whether you have

25  any specific recollection of Mr. Hines asking you to file an


67


1  appeal?

2  A.   No, I don't.

3  Q.   If Mr. Hines asked you to file an appeal sitting here in

4  this courtroom, counsel, why didn't you file an appeal on his

5  behalf?

6  A.   If he asked me to file it and I did not file it, I would

7  have no good explanation for why that did not happen.

8  Q.    You can't say whether it ever happened?

9  A.    No, I can't.

10  Q.    You can't recall ever an instance as a Federal Public

11  Defender someone asking you to file an appeal and you being a

12  zealous advocate for your client failing to do so; you don't

13  recall that ever happening, do you?

14  A.    No, I had one other client make a very similar claim to

15  this, it was out of a Pittsburgh case that I handled and

16  actually my testimony was a lot like it was today.  I just

17  didn't recall, just didn't recall whether or not it happened.

18  So I don't ever recall knowingly having someone tell me I want

19  to appeal and then just saying -- and then not filing an

20  appeal.  I've never knowingly done that.

21  Q.    And here you can't refute -- you have no recollection of

22  this supposed conversation ever happening here in the

23  courtroom?

24  A.    No.  I mean I'm sure I talked with Dan after the sentence

25  was imposed, like I said, that would just be a normal thing.

68

1  But I do not have any independent recollection of the content

2  of any conversation.

3  Q.   And if the content included the filing of an appeal,

4  counsel, you would have filed an appeal?

5  A.   If I understood Dan to be telling me I want you to file

6  an appeal, I would have filed an appeal.

7  Q.   And when you sent your letter within 10 days of that

8  resentencing, if you were asked to file an appeal, wouldn't the

9  letter have made some reference to the status of the appeal?

10  A.   If I had thought that Dan asked me to file an appeal, I

11  don't know if it would have been referred to in that letter or

12  not, because even in cases where there's going to be an appeal,

13  I let the Pittsburgh office know that, even if they're going to

14  handle the appeal, I would have sent out a letter virtually

15  identical to the letter I sent to Dan in this case, saying

16  here's the amended judgment in your case.  I send that out

17  whether there's going to be an appeal or not.

18  Q.   Do you think you did that in the first sentencing, even

19  though an appeal was filed within 10 days?

20  A.   Yes, I would think that there should be a letter after

21  the first sentencing, sending Dan the judgment that was entered

22  by Judge McLaughlin.  It's our standard practice to always send

23  a copy of the judgment to a client, regardless if there's going

24  to be an appeal or not.  And we do that whether or not, even if

25  there's going to be an appeal that the Pittsburgh office is


69


1  going to handle, it would be my office that would send out a

2  copy of the judgment.

3  Q.    Counsel, in your representation of your clients after

4  they've been sentenced, do they have access to telephone

5  facilities in the federal Bureau of Prisons?

6  A.    They can call collect.

7  Q.    Can they call the Public Defender's Office?

8  A.    Sure.

9  Q.    And have you or do you receive collect calls from former

10  clients or individuals who are incarcerated when they want to

11  talk to you?

12  A.    Yes.

13  Q.    After the sentencing or resentencing in this case, did

14  Daniel Hines ever call you collect from any prison facility to

15  complain about the fact that you hadn't filed an appeal?

16  A.   I don't believe so.

17       MR. PICCININI:  That's all I have, judge.

18       THE COURT:  Okay.  Mr. Mead.

19            CROSS-EXAMINATION

20  BY MR. MEAD:

21  Q.   Mr. Patton, you were asked a question from Mr. Piccinini

22  referring to your responsibility -- what was that comment, I'm

23  sorry, he sort of said something and went to another question?

24  A.   I believe what I had said was that it's up to me to

25  determine whether the client wants to appeal or not.  And if I


                        70


1  don't, in my opinion, if I don't do a sufficient job so that I

2  know whether or not it's clear to me whether or not the person

3  wants to appeal or doesn't want to appeal, then I haven't done

4  my job right.

5  Q.   If you had spoken directly to Mrs. Hines, there would be

6  no phone message from your secretary, correct, you would have

7  just talked to her directly?

8  A.   That's true, sometimes I answer the phone directly

9  myself.  And if that were the case, there would be no message.

10   Q.   So whether or not there is a message from Mr. Hines

11   written on a piece of paper is not indicative of whether or not

12   you had a conversation?

13   A.   No.

14   Q.   Am I correct?

15   A.   Yes.

16          MR. MEAD:  Okay.  May I see the exhibits, your

17   Honor.

18          THE COURT:  Yes.

19   BY MR. MEAD:

20   Q.   The letter of August 10, 2005, enclosing the amended

21   judgment, am I correct probably that your secretary drafted

22   that and you just signed it?

23   A.   Yes, that is a common letter, that after every sentencing

24   she'll actually pick up the judgments from, we have a mailbox

25   at the Clerk's Office here in the courthouse.  The judgments


71


1   get put in that box, my secretary will come down, she comes

2   down everyday to check to see what we got in there.  If there

3   are judgments in there, she takes them back to the office, does

4    up this standard letter and puts it in my box to just sign.

5    Q.    The fact there is not any mention of an appeal one way or

6    the another is not indicative of what Dan may have said to you

7    on the date of the resentencing, correct?

8    A.    Yes, with that particular letter, even if there was going

9    to be an appeal and I was going to be the attorney handling it,

10   there wouldn't normally be -- well, I don't want to overstate

11   it, it's possible I would put something in there about

12   there's -- you know, the notice of appeal has been filed, we're

13   going to file it, I wouldn't necessarily put that in, that is

14   just kind of a standard letter that goes out.  And I have to

15   say with the letters, sometimes we send them to clients, we

16   send them to the institution that we believe they're housed in,

17   sometime they've been moved and come back saying, you know, the

18   inmates no longer here, then we have to figure out where our

19   client actually is and then get it to that institution.

20   Q.    Because they're being transported to the prison, you're

21   not sure when they're going to arrive?

22   A.    Right, like the one letter I believe is addressed to Dan

23   at the Crawford County Correctional Facility, because Dan had,

24   while he was there for the original sentencing, may have been

25   after the resentencing, he had pending charges in Crawford

72

1  County.  If you send a letter to the institution and the

2  inmate's no longer there, they don't try to figure out, the

3  institution doesn't try and figure out where the person is and

4  forward it on, they just send it back to the office.  And then

5  we have to figure out physically where our client is.  Then

6  resend the letter, to get it out.

7  Q.    Exhibit 3, which is the letter from your Pittsburgh

8  office to Mr. Hines, is in care of the Erie County Prison,

9  correct?

10  A.    Sure.

11  Q.    So there was no letters directly to Mr. Hines at the

12  federal institution where he was incarcerated, to your

13  knowledge?

14  A.    Not in those exhibits.  There might have been some

15  further along in the original, the appeal of the original

16  sentence that were sent to Dan in the federal facility.

17  Q.    But not in any of those exhibits that you just saw?

18  A.    That's correct.

19       MR. MEAD:  That's all I have, your Honor.

20          REDIRECT EXAMINATION

21  BY MR. PICCININI:

22  Q.    In that regard, counsel, was there any indication in the

23  file that the letter that was specifically talked about, was

24  sent back to the Public Defender's Office to be resent out

25  again with a different address?


                              73


1   A.    I haven't gone through the file looking for it, but it

2   would not be uncommon.  We'll get it back unopened with -- most

3   of the facilities have like a sticker that they just throw on

4   there, it says inmate no longer here.  We don't as a practice

5   keep those.

6   Q.    We talked a lot in generalities today, but my question to

7   you, counsel, is you don't know if such a thing happened with

8   regard to Mr. Hines?

9   A.    I do not.

10  Q.    With regard to someone who would be sentenced on November

11  22, 2005, in your experience, is it likely that he made it into

12  the Marshal's system and gets on the Marshal's shuttle service

13  and makes his way to a federal prison facility within 10 days?

14  A.   No.

15       MR. PICCININI:  That's all I have, your Honor.

16       MR. MEAD:  Nothing further, your Honor.

17       THE COURT:  Thank you, Mr. Patton.  Did you move all

18  of your exhibits, Mr. Piccinini?

19       MR. PICCININI:  Your Honor, if I hadn't moved all

20  those, I would move Government Exhibits 1 through 5.

21       THE COURT:  They're admitted.  Anything else by way

22  of documentary evidence or oral testimony?

23       MR. MEAD:  No, your Honor.

24       THE COURT:  Do you want to sum up here?

25       MR. MEAD:  If I may, your Honor.  Your Honor, as I'm


74


1  sure the court is aware that the Third Circuit recently

2  clarified the rule regarding a failure to appeal in a case

3  entitled Harrington_v._Gillis.
   _____ __ _____

4       THE COURT:  Don't be so sure.

5       MR. MEAD:  I have a copy.  It is a recent case, your

6  Honor, it came out in July of this year.

7          THE COURT:  What proposition does it stand for?

8          MR. MEAD:  What it does is it defines the Strickland
                        _____

9    test as it pertains to a situation which we have here, where

10   there is a failure to file an appeal, and with which the

11   defendant asks for an appeal to be filed.

12         THE COURT:  What is the citation of that case?

13         MR. MEAD:  456 F.3d 118, (3rd Cir. 2006).

14         THE COURT:  Does it clarify Solis in some
                                        _____

15   particulars?

16         MR. MEAD:  Yes, it does, your Honor, I think it's

17   very relevant to the test that the court has to apply here.

18         THE COURT:  This is what we're going to do.

19   Partially because I want to read the case and partially because

20   I'm still fighting the flu.  But I want to read that case

21   first.  Because I need to know the legal underpinning in my

22   head as I'm sifting through the facts here.  So we're going to

23   take a recess here and come back, do the summations, hopefully

24   I'll be able to get something on the record after lunch.  Let's

25   be back here at a quarter to one, we'll come back and we'll

75

1   finish up.

2          (Luncheon recess from 11:35 a.m.; until 12:55 p.m.)

3          THE COURT:  All right, Mr. Mead.

4          MR. MEAD:  Your Honor, I'm sure you've had a chance

5   to review the case that I had provided earlier, Harrington_v.
                            _____ __

6   Gillis.  In that case, your Honor, it seems that there are two
    _____

7   tests that they're talking about, whether or not it's

8   ineffectiveness of counsel to not appeal.  The first test

9   indicates whether or not counsel actually consulted with his

10  client.  And if counsel did consult with his client and the

11  client said I want an appeal, that they have to file an appeal,

12  I'm sorry, counsel has to file the appeal.

13         THE COURT:  On this record, putting aside the issue

14  of whether there was a directive to appeal, I could fairly find

15  that there was some consultation relative to an appeal, could I

16  not?

17         MR. MEAD:  Your Honor, if I may.  I think the word

18  consult is defined in this case.  I'm not sure it reached the

19  level of adequate consultation.  I think there may have been

20  the discussion, but I'm not sure -- I think what would happen

21  here is in the second test, when it talks about whether or not

22  counsel consulted with his client.  Consulting is defined in

23  the case as "advising the defendant about the advantages,

24  disadvantages of appeal and making a reasonable effort to

25  discover the defendant's wishes."

76

1       My argument would be, set aside the first one,

2  whether or not there was a direct request to do it.  Our

3  argument is yes, although, I'll go into that in a minute.

4  Let's say he did ask directly hey, let's do it again.  I think

5  there is no reason he wouldn't in this situation.  This is a

6  public defender, he's not going to have to pay an attorney to

7  do an appeal.  He has absolutely nothing to lose by doing this

8  appeal again.  I think that, combined with his mother's

9  testimony, that he thought an appeal had been filed, shows that

10  there was some credibility on his behalf.

11       Mr. Patton was candid, he says he doesn't recall

12  what happened that day.  We all know Mr. Patton is a very, very

13  effective counsel, I'm certainly not begrudging him that.

14  However, he does have 80 cases a year, according to his

15   testimony.  And he even said if I didn't follow up on this,

16   something along the lines that if I didn't follow-up on it,

17   it's my fault.  I submit that may have been what happened here

18   in all candor.  I think that we had a discussion from Mr.

19   Hines, hey, let's do it again.  Mr. Patton may not have

20   interpreted that as let's file an appeal again.  At that point,

21   though, your Honor, I would say that it was Mr. Patton, not Mr.

22   Hines' obligation, to follow-up on that issue.  At that point

23   Mr. Hines is taken by the Marshals away from his sentencing,

24   who knows where he's going to be the next few days, he may go

25   to Erie, he may go to Crawford County, he may be anywhere.


                                77


1            According to the case law, according to Harrington,
                          _____

2   it does say that a consult involves making a reasonable effort

3   to discover defendant's wishes.  I would submit even if the

4   court would find there wasn't a direct request, that there

5   wasn't a reasonable consult, either.  If we get to that second

6   test, where there wasn't a reasonable consult, we have to look

7   at the last part of this test in which it says but for this,

8   was there a reasonable probability that Mr. Hines would have

9   appealed.

10   And that I think that answer is pretty clearly yes, he did want

11   to appeal.

12        THE COURT:  If I were to credit your client's

13   testimony in this regard, where he indicated Mr. Patton advised

14   him that an appeal, I'm paraphrasing, the prospects of success

15   would be poor.  I think his words were it wouldn't do any good,

16   you wouldn't win, something along those lines.  That's a type

17   of consultation, isn't it, he was given advice?

18        MR. MEAD:  Yes, he was given advice.  But I'm not

19   sure that advice is enough.  Because you may say to your

20   client, listen, I'm not sure we're going to win.  But the

21   client, at least in my experience, is going to say well, give

22   it a shot.  I mean just because you say you may not win, it's a

23   non-frivolous issue, obviously, Mr. Patton admitted that.  I

24   think at this point if Mr. Hines had told him, well, let's try

25   it again, I want to try it again, he's duty bound to do it

78

1   again.  If there was a discussion in which it wasn't clear to

2    Mr. Patton or let's do it again didn't register with Mr.

3    Patton, considering the fact that obviously it was an important

4    issue to Mr. Hines, as he's testified, there's been testimony

5    here already, this gun enhancement is important in the jail

6    situation.  It may not cut his time down, but he does lose the

7    opportunity to participate, either participate in the drug

8    treatment program in prison or loses the opportunity to get a

9    year or so cut off his sentence.  Obviously, this is a very,

10   very important issue to Mr. Hines.

11          Again, Mr. Patton has a lot of cases, it may have

12   slipped his mind, he may not have been clear on it.  But if he

13   was told to appeal, he has to appeal it.  If it was not clear

14   enough, it is Mr. Patton's obligation to talk to Mr. Hines

15   again and say what do you want to do here.  Do we want to an

16   appeal.  Because it is an important issue to Mr. Hines, I think

17   he made that clear.  And it's brought up at the second

18   resentencing at least twice.  Once it's preserved by Mr. Patton

19   at the beginning of the hearing.  The second time, Mr. Patton

20   at page 15 of the transcript, brings up the fact that, listen,

21   if there's this gun enhancement, he loses the opportunity to

22   have a year cut off his sentence.

23          I would submit that under the Harrington guidelines,

24  that number one, it was ineffective because he did request it,

25  Mr. Hines did request an appeal, it was not done for whatever

79

1  reason.  Maybe it slipped Mr. Patton's mind.  Again, we all

2  know he's a good attorney, but he does have a big case load.

3       Number two, maybe he didn't quite catch what should

4  have -- what the client wanted to do.  And he had an obligation

5  under the Harrington case to follow-up on that.
   _____

6       And, again, I go back to the fact that there's

7  absolutely nothing to lose by this client asking to appeal, he

8  has nothing to lose whatsoever.

9       And, again, I would also point out that Mr. Patton

10  does not recall that conversation.  We do have a specific

11  recollection from the defendant and his mother, who called and

12  said I talked to my boy, he thought the appeal was ongoing.

13       I also want to point out one fact.  The fact that

14  Mr. Hines did not receive paperwork about an appeal or not an

15  appeal, I think that's irrelevant.  He trusts his attorney.  He

16  never at one point said that Mr. Patton didn't do a good job

17  for me or he didn't like Mr. Patton or he was a bad attorney.

18  He trusted his attorney.  He thought he told him I want an

19  appeal, it was done.  It was only that things didn't happen

20  after a long period of time, he consults with his mother and

21  his mother talks to Mr. Patton, that it's made known to him

22  that no appeal was filed.

23      I would submit that both on a credibility issue,

24  that Mr. Hines deserves credit on the credibility.  Again, Mr.

25  Patton doesn't dispute what he says, he just said according to


80


1  my pattern, I probably, if he asked me to, I would have filed

2  an appeal.  But he didn't say he didn't ask me to.  So both on

3  credibility and the law, as far as inadequate consultation with

4  him, following an immediate sentencing, where he's taken off by

5  the Marshals, they have maybe a one or two minute conversation.

6  That's my argument.

7      THE COURT:  All right, thank you, Mr. Mead.  All

8  right, Mr. Piccinini.

9      MR. PICCININI:  Your Honor, first off, I would just

10  note that the government's papers don't address the Harrington

11    v._Gillis matter.
___ _____

12         THE COURT:  But they're going to.

13         MR. PICCININI:  They will currently.  It may be a

14    timing thing, we filed our brief in July.

15         THE COURT:  Let me just say this to you.  Partially

16    because I feel so lousy, my memory is not clicking like it

17    should.  I'm not going to rule on this thing today.  But, go

18    ahead, then I'll tell you about post-hearing submissions and

19    whatnot.

20         MR. PICCININI:  Your Honor, just some factual

21    issues.  Because as I look at Harrington_v._Gillis, and the
_____ __ _____

22    underlying Supreme Court case, Roe_v._Flores-Ortega, which
___ __ _____

23    clearly sets forth the parameters of your analysis of this

24    issue.  There's a couple of threshold things that need to be

25    decided.


81


1         One, is this a case where there was a need for

2    meaningful consultation.  Because in the Supreme Court case

3    they very clearly say and reject Justice Souter's desire to

4    have a bright line test, per se test, that in all cases you

5    must consult with a client concerning whether to have an

6    appeal.  The first question is, is this a situation where you

7    must have that consultation.

8         THE COURT:  What's the test for that?

9         MR. PICCININI:  It's whether or not a rational

10   defendant would want to appeal.  And, two, that this particular

11   defendant reasonably demonstrated to counsel that he was

12   interested in appeal.

13        I agree with the representation of what a

14   consultation is.  So once you're through that threshold

15   question, because the Supreme Court says, for example, a

16   rational defendant would want to appeal if there are

17   non-frivolous grounds for appeal.  And this enhancement here, I

18   guess could be claimed as not being a frivolous ground for an

19   appeal.  There is a factual decision you made, although, the

20   likelihood of success is not high.  Because this was a

21   sentencing, preponderance of the evidence standard.  Then we go

22   to whether, let's say this is one where he had consulted, did

23   he consult.  And what I'm left with is defense counsel's

24  belief, as he has done in all cases, that he would stay here,

25  and part of what he would discuss with the defendant are issues

82

1  related to appeal.

2        THE COURT:  You mean as a matter of his common

3  practice?

4        MR. PICCININI:  As a matter of his common practice.

5  He recalls sitting here in the courtroom and having some

6  discussion with the defendant.  But I'm left in a case where

7  there's no specific recollection by defense counsel of the

8  conversation.

9        But on the question whether there was consultation,

10  you look to what the defendant says.  And the defendant's

11  claims that there was some give and take over his desire, not

12  necessarily to have an appeal, but I think the words he used

13  was try again.  And some discussion, the defendant even claims,

14  by counsel, that something along the lines that it would be

15  fruitless.  That clearly seems to be meaningful consultation as

16  required by the rules.

17        Because I think it's important to note here that

18  this is not an original sentencing and an original appeal.

19  This is a resentencing.  This is a defendant who had been

20  through the process, had previous consultation, had a long

21  two-year longstanding relationship with defense counsel.  Had

22  been through an appeal.  Had received all the correspondence

23  for appeal.  And the length of that discussion was, did not

24  have to be as lengthy here in the courtroom as it did for

25  someone who was going through the process for the first time.

83

1       But there are portions of the defendant's claim with

2  regard to how directly he requested the appeal that I think are

3  incredible.  Because in the end if you look at was it

4  reasonable for this defendant to have asked for an appeal.  One

5  would look at this record and say not really.  He had already

6  been through an appeal once, came back for resentencing.  The

7  statutory mandatory minimum penalty was 120 months.  This is a

8  defendant who only received 15 months more than the statutory

9  mandatory minimum.  This isn't some defendant, who as a result

10  of the enhancement, received some significantly higher or

11  double his sentence because of the proceeding.  We were talking

12    only 15 months.

13        THE COURT:  How much did the enhancement kick up his

14    guideline range, do you know?

15        MR. PICCININI:  It kicked it up two levels.  As I

16    recall, he was at a criminal history category of three.  So he

17    was at a level 31.  Where his guideline, with the enhancement,

18    was 135 to 168.  Really the only thing that the defendant could

19    be arguing in a post Booker world on sentencing was the

20    reasonableness of the sentence.  If you knock off those two

21    points and get from a 31 to a 29, his guideline sentence was

22    108 to 135.  The 135 month sentence that you gave fell both

23    within the 29, the level 29 without the weapons enhancement,

24    just as it did at the bottom range of the enhancement or,

25    excuse me, the guideline with the enhancement.  Not only are we


84


1    talking only the difference between a mandatory 10, that he

2    couldn't get out from under no matter what the appeal says,

3    you're looking at a reasonable sentence that fell within the

4    guideline with the enhancement, and within the guideline

5    without the enhancement.  So just from a standpoint of is this

6  the type of sentence you would want to appeal, you look at

7  that.  Now, he comes in today and testifies that his real

8  reason for wanting to appeal is to be able to get into the drug

9  treatment program, had nothing do with lessening his sentence.

10      THE COURT:  It's still not clear to me, either get

11  into it or get some credit?

12      MR. PICCININI:  I think it is unclear, the argument

13  at the resentencing was the credit, or even if you got in it,

14  it would knock off your time.  And I don't know the answer to

15  the question.  There's some indication today that it had some

16  impact as well at the resentencing.  If you look at the

17  defendant's petition, your Honor, I think this is telling

18  because this is drafted by the defendant, as his mom testified,

19  it's something that he put together.  The defendant

20  specifically talks about this enhancement and having no affect

21  on the drug treatment program whatsoever.  But only on the

22  length of the sentence that he would receive.  He says right

23  here in Section A on page 6 of 9 of the electronically filed

24  document, "and wherein with the removal of the 2 point gun

25  enhancement my final sentence would have been lesser, and or

1  with new direct appeal I would have had the opportunity to

2  re-argue this point."  Everything in this petition, all the way

3  up to July of this year, had to do with the length of his

4  sentence.  And my point in telling you this is I think it's

5  somewhat lacking in credibility that there is some larger

6  reason for this appeal, for the reason why he wanted this

7  appeal, for the drug program.  I don't think it was ever

8  mentioned with counsel as the basis of the appeal.  Here he is

9  in his papers only complaining about the length of the

10  sentence.  And we know that the sentence is a sentence that

11  fell within even the lower guideline range and was only 15

12  months higher than the mandatory minimum.

13        THE COURT:  But only for the sake of discussion and

14  putting aside this question about its potential impact on his

15  ability to participate in the drug program, what is the

16  downside risk of taking one more swing at the ball.  He's not

17  paying for it.  Best case scenario -- although, quite frankly,

18  I concur with Mr. Patton's view that it would have been an

19  uphill battle on appeal.  What's the downside, if you win, your

20  guideline range is reduced and maybe you get sentenced lower,

21  what's the downside?

22     MR. PICCININI:  From a defendant's standpoint, no

23  downside whatsoever.  For the government, your Honor, this

24  confirms that the request to take an appeal was never made.

25  This is not a case where Attorney Patton, when requested to


86


1  file an appeal, would have had some strenuous objection to the

2  defendant, don't take this appeal, it will adversely affect

3  you.  Don't waste your time taking this appeal.  This is one

4  where it was counsel who advocated all these things strenuously

5  at sentencing and resentencing.  It was counsel who claimed

6  today that he knew these were not non-frivolous issues.  It's

7  that same counsel who --

8     THE COURT:  So you're saying he wouldn't have been

9  reluctant to do it if he was instructed to do it?

10     MR. PICCININI:  No, it plays as much in that regard

11  as it does to defendant's claim that he asked for it.  I think

12  the problem here is that the defendant didn't ask for it.  And

13  the defendant never communicated his desire.  He accepted as

14  part of the entire discussion both at the sentencing and the

15  resentencing.  He accepted what was clear to him that the

16  likelihood of prevailing was not, was very unlikely.  He did

17  not request an appeal to be had.

18        And then six to eight months after his sentence,

19  long passed his appellate rights had expired, he has to couch

20  this in terms of ineffectiveness of counsel, because he's now

21  in jail and becomes somewhat knowledgeable on the law on this

22  issue.  And that's when the thing gets filed.  Because, judge,

23  his claims today that the first time around when I appealed, it

24  was just a long time before I got any notice about this appeal.

25  I remember the paperwork took a long time to come.  Well, it

87

1  didn't, your Honor.  Within the time period for the 10-day

2  period to appeal, he's mailed the notice of appeal.  It's not

3  just the notice of appeal, it's lengthy two-page correspondence

4  concerning everything that goes on in the process.  And

5  counsel's office was in touch with him.

6        Now, we look at the resentencing.  He receives

7  within 10 days the judgment, where you reduced the sentence to

8  135 months.  He doesn't receive any appellate paperwork, he

9   doesn't receive any correspondence.  He receives nothing.  If

10  this were a true claim that he knew he could appeal and wanted

11  to do so, he could have communicated it.  Why does he wait

12  months and months and months.  And Attorney Patton does not

13  recall any conversation with the mother with regard to the

14  issue.  But it's interesting he recalls conversations with her

15  about a motorcycle, multiple conversations.

16          THE COURT:  What am I to make of the mother's

17  testimony?

18          MR. PICCININI:  Well, I have concerns with the

19  mother's testimony.  It seems to me she did have multiple

20  conversations with counsel.  But I don't believe they were

21  conversations concerning the defendant's desire to file an

22  appeal.  If they were, they were solely a claim that now, six

23  months later, the defendant realizes his desire to take an

24  appeal, it's too late, and counsel can't be ineffective for not

25  filing an appeal.  Or, unfortunately, the conversation never

88

1   took place.  Because if counsel would recall the motorcycle

2   conversations, why wouldn't he recall a mother contacting him

3    and telling him that their son is dissatisfied because you

4    failed to file the appeal that you were supposed to file on his

5    behalf.

6           And then even after that March, April timeframe, we

7    now wait until July of this year for the filing of the Habeas

8    petition.  A Habeas petition that doesn't mention the drug

9    problem whatsoever, just mentions some ineffective claims with

10   regard to the enhancement, and actually with regard to claims

11   on his prior record.  So I think, from a credibility

12   standpoint, there are concerns.

13          This is a defendant who, contrary to his claim and

14   testimony today, received notice of the first appeal.  This is

15   a situation where, as is the regular practice, the first time

16   this defendant wanted to appeal, Patton's office sends a letter

17   or an e-mail to the Pittsburgh office, what does it say next to

18   Mr. Hines.  Appeal, yes.  The next time around, within days,

19   this isn't a matter of Attorney Patton just forgetting, within

20   days an e-mail goes out on the resentencing, no appeal, written

21   in bold letters, no appeal.  That's the product of some

22   thought, some actual steps taken upon consideration of whether

23   this was a case for an appeal to be filed.  And we're now a

24   year removed.  Whereas, the time this e-mail goes out, we're

25  days removed.  Around the same time that e-mail goes out, where

89

1  it says there is no appeal going to be filed, Attorney Patton

2  is sending the judgment and conviction, mailing it to the

3  defendant at the prison.  Had there been any discussion or any

4  communication concerning the appeal, the appeal would have been

5  filed.

6          And I think if you look at the Supreme Court case

7  and the Third Circuit case, the first question was there

8  consultation.  And here I believe you have a record that is

9  supportive of there having been a consultation.  Then the

10  second question is --

11          THE COURT:  But that all has to come -- Patton says

12  he has no specific memory of the substance of the conversation,

13  that's understandable given the amount of time.  Tell me again

14  by your lights what do I have of record, either direct or

15  circumstantial, which supports a consultative event within the

16  meaning of the case?

17          MR. PICCININI:  My difficulty here is -- a lot of

18  this comes from the testimony of the defendant, which I believe

19  half of which is not credible.  So it puts me in a bind in

20  making the argument.  You do have counsel recalling sitting

21  here at counsel table with the defendant --

22        THE COURT:  Talking about something?

23        MR. PICCININI:  Talking about something.  I can't

24  make the record any better than it is.  It highlights the

25  difficulty for the government in these ineffectiveness claims

90

1  where a defendant claims something, and this is my second

2  Habeas petition in a row where defense counsel doesn't recall.

3  And it's been a year --

4        THE COURT:  What was the other one?

5        MR. PICCININI:  In McCoy, we had testimony that a

6  lot of the issues concerning a matter that was raised, there

7  was a lack of recollection as to discussions on that issue.  So

8  I'm left defending defense counsel, as is my job in these

9  Habeas petitions, without much testimony from the defense

10  counsel.  A defense counsel who clearly has the desire to

11  achieve on behalf of his client, because he still maintains an

12  attorney-client relationship, some leniency in sentencing.  I'm

13  not saying Attorney Patton has done doing anything wrong, but

14  it make it's very difficult for the government to advocate in

15  that light.  Because I see in the midst of testimony, not that

16  it's necessarily providing guidance to defense counsel who is

17  claiming his ineffectiveness, on how to properly advocate the

18  ineffectiveness.  I'm not saying that Attorney Patton was

19  dishonest in any way in his testimony.  He does not recall.  It

20  certainly helps the defendant that he does not recall.

21          But you do have circumstantial evidence that shows

22  in the way this process works, if this man would have indicated

23  to counsel and would have made it clear his intention or his

24  desire to appeal, that with this particular defense counsel you

25  know your Honor that he would have appealed.  And from a


91


1  procedural standpoint, if the conversation took place, there

2  would have been further communication with this defendant

3  concerning his desire to appeal and the right to appeal.  And

4  those things are absent from the record, I think it's

5  circumstantial evidence that the conversation never took place.

6    An e-mail goes out within days saying no appeal would be filed.

7    It would not have happened within days of the defendant asking

8    that an appeal be filed.  And, at best, we have the defendant's

9    testimony where he says let's try it again.  Mr. Patton

10   explains to him, according to the defendant, the fact that, I

11   think we would all agree, it's not a highly likely successful

12   appeal.  The defendant doesn't respond to that in any way.  He

13   doesn't say today that he responded.  He doesn't say well, I

14   said let's appeal anyway.  His acquiescence after the

15   consultation with the defense attorney about the lack of any

16   success of an initial appeal, can in no way provide an

17   indication to this court that the defendant clearly expresses

18   his intention to appeal.

19        I think if you look at the factual scenario in the

20   Harrington case, there you have some discussion about an
     _____

21   appeal, you have defense counsel actually sending a letter,

22   bringing the appeal paperwork, and then you have months and

23   months of attempts to discuss with defense counsel the desire

24   to appeal.  Here we have nothing.  We have no record of a phone

25   conversation.  We have a defendant who has access to collect

1  calls to his attorney.  No phone calls ever.  He has the

2  ability for months and months to have correspondence with

3  counsel.  None whatsoever.  And no record whatsoever of a

4  conversation with the mother.  Only a recollection of

5  conversations concerning a motorcycle that needs to be

6  returned.

7          So a lot of this is going to rise and fall on a

8  credibility determination made by the court.  I can't add

9  anything to the record about the degree of consultation, it all

10 has to come from the files of counsel, from counsel's

11 discussion.  But I think between those two cases, Flores-Ortega
                                          _____

12 and Harrington_v._Gillis, that's where we're going to go with
      _____ __ _____

13 this thing.

14         THE COURT:  All right.  Anything you want to say

15 before we break?

16         MR. MEAD:  No, your Honor, I think the court pretty

17 much knows our position.  If the court has any questions of me?

18         THE COURT:  I don't.  But let me tell you what I'm

19 going to do.  From whatever date this transcript of the hearing

20  and the post-hearing argument is filed, each of you will have

21  20 days.  I think this is important in this case, because what

22  was said is very important.  I can make a credibility

23  determination, but I have to look at the transcript here.  You

24  have 20 days from the receipt of the transcript to file what I

25  guess I'm going to characterize as your proposed findings of


                                    93


1  fact and conclusions of law, essentially.  And then I'll take a

2  look at them, I'll either put something on the record or we'll

3  get out an opinion.  All right, thank you.

4

5          (Whereupon, at 1:20 p.m., the proceedings were

6  concluded.)

7

8                          - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

94

1          C E R T I F I C A T E

2

3

4

5          I, Ronald J. Bench, certify that the foregoing is a

6     correct transcript from the record of proceedings in the

7     above-entitled matter.

8

9

10

11

12 _____

13  Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25